Todd D. Carpenter (SBN: 234464)
todd@lcllp.com
**LYNCH CARPENTER, LLP**
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
Telephone: (619) 762-1910

[Additional counsel on signature page]

*Attorneys for Plaintiffs and Proposed Classes*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EBONIE MAXWELL, JESSICA GONZALEZ, YENTLE POTTS, and CHAKA THEUS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LAVENDER LINGERIE, LLC, SAVAGE X, INC., SAVAGE X GC, LLC, and TECHSTYLE FASHION GROUP,<br><br>Defendants. | Case No.: 2:26-cv-06670<br><br>**CLASS ACTION COMPLAINT**<br><br>**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Ebonie Maxwell, Jessica Gonzalez, Yentle Potts, and Chaka Theus (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Class Action Complaint against Defendants Lavender Lingerie, LLC; Savage X, Inc.; Savage X GC, LLC; and TechStyle Fashion Group (collectively, the "SXF Parties" or "Defendants"), and allege as follows based upon information and belief, except as to the allegations specifically pertaining to Plaintiffs, which are based on personal knowledge:

1.     Robyn Rihanna Fenty – known worldwide simply as "Rihanna" – is a beloved global icon.  "Savage X Fenty," the lingerie brand/business that she founded in 2018, however, has not held up in the spotlight as well as the singer has performed.

2.     In late 2022, for example, "Rihanna's Savage X Fenty [agreed to] pay $1.2 million to settle a consumer protection lawsuit waged against it for allegedly misleading consumers about its renewal practices and pricing."[1]  As explained in *The Fashion Law*:

> According to the August 2022 complaint filed by the Santa Clara, Santa Cruz, San Diego, and Los Angeles County District Attorney's Offices, and the Santa Monica City Attorney's Office, Lavender Lingerie LLC dba Savage X Fenty ran afoul of California state law by failing to "get the proper consent or give proper notices for the automatic renewal charges, falsely advertis[ing] the ability to use store credit, and misleading the public over the prices of its products, which include bras, underwear, sleepwear, and loungewear."  Beyond that, the prosecutors asserted that Savage X Fenty "did not clearly disclose automatic charges resulting from VIP memberships."
>
> In a statement announcing the settlement …, which will see Savage X Fenty pay $1 million in civil penalties, $50,000 in investigative costs, and $150,000 in restitution, Santa Clara Deputy District Attorney

---

[1]   "Rihanna's Savage X Fenty to Pay $1.2 Million to Settle Consumer Protection Lawsuit," *The Fashion Law* (Dec. 2, 2022), *available at* https://www.thefashionlaw.com/rihannas-savage-x-fenty-to-pay-1-2-million-to-settle-consumer-protection-lawsuit/ (last visited June 17, 2026) ("*TFL*").

Jennifer Deng said, "Consumers have a right to know up front what they are paying for and how often. Businesses have a duty to be transparent about their automatic renewal charges." …

…

The settlement comes a couple of years after advertising watchdog TINA.org initiated an investigation into the marketing of Savage X Fenty's membership program, alleging that it found that the company was violating U.S. federal law. According to formal complaints that it filed with the Federal Trade Commission ("FTC") and Santa Cruz County District Attorney's Office, respectively, Connecticut-based TINA.org argued back in February 2020 that TechStyle, Inc. – which Rihanna maintains a joint venture with to manufacture/market the $150 million-plus Savage X Fenty brand – was in breach of a 2014 settlement it entered into after being sued by the state of California for allegedly misleading customers about automatic monthly payments charged to their credit cards in connection with its JustFab.com, Fabkids.com, Shoedazzle.com and Fabletics.com businesses.[2]

3.    Unfortunately, the SXF Parties, which, collectively, operate and market "Savage X Fenty," have continued to engage in one impermissible act after another

---

[2]    *TFL*, *supra*. *See also*, *e.g.*, "Attorney General Ellison secures injunction and nearly $365k in settlement with clothing retailer regarding deceptive advertising and billing," *The Office of Minnesota Attorney General Keith Ellison* (Oct. 23, 2025), *available at* https://www.ag.state.mn.us/Office/Communications/ 2025/10/23_TFG-Holdings.asp (last visited June 17, 2026) ("Attorney General Keith Ellison today announced a settlement with TFG Holding, Inc., a clothing retailer that offers shoes, clothing, and accessories across several different brands, including JustFab, ShoeDazzle, and FabKids. … The settlement announced today resolves numerous issues uncovered by Attorney General Ellison during a long-running multistate investigation. AG Ellison alleges that TFG misrepresented the price of goods offered for sale in retail stores in Minnesota by adding a surcharge between 3.75% to 5.25% at the point of sale and labeling the surcharge a 'tariff' fee. The fee was used by TFG to recover costs related to import and customs duties. The AG alleges that advertising one price and charging another price with the added 'tariff' fee was deceptive.").

to deceitfully profit off of "Savage X Fenty" customers (both in stores and online). Most recently, the SXF Parties have, *inter alia*:

a) engaged in deceptive "drip pricing" between and including (at least) April 2, 2025 and February 20, 2026 and charged customers hidden, surprise tariff-related fees and/or surcharges, *i.e.*, "junk fees," ostensibly as a result of, due to, and/or to offset new tariffs imposed by U.S. President Donald J. Trump in 2025;

b) continued to engage in drip pricing after February 20, 2026 (when the U.S. Supreme Court, in *Learning Resources, Inc. v. Trump*, 607 U.S. ----, 146 S. Ct. 628 (2026), found that President Trump lacked the power to impose the new tariffs) and to charge customers hidden, surprise tariff-related fees and/or surcharges, *i.e.*, junk fees, thereafter;

c) misrepresented tariff-related fees and/or surcharges as "taxes;"

d) failed to refund the tariff-related fees and/or surcharges charged to and collected from consumers between and including (at least) April 2, 2025 and February 20, 2026, even though the Supreme Court found that the 2025 tariffs at issue were illegal;

e) made "Savage X Fenty" "Membership Credits" ("Credits"), for which consumers paid, expire after 12 months in violation of California Civil Code § 1749.5 ("Section 1749.5" or the "Gift Card Law"); and

f) failed to (i) provide consumers with the requisite notice that, *inter alia*, their "Savage X Fenty" "Rewards Membership" (and the attendant monthly charge) would continue indefinitely unless and until they cancelled their memberships; (ii) obtain consumers' express affirmative consent to the automatic renewal or continuous service offer terms of the membership; and (iii) allow for consumers to easily cancel their memberships, *i.e.*, "Savage X Fenty" obstructs and delays consumers' abilities to cancel the continuous service.

CLASS ACTION COMPLAINT

4.     By undertaking these and/or other acts, as well as conspiring among themselves, the SXF Parties have, *inter alia*, violated both state and federal law and unjustly enriched themselves at the expense of "Savage X Fenty" customers.

**The Parties**

5.     Plaintiff Ms. Maxwell is a resident of Joliet, Illinois, and a citizen of the State of Illinois.

6.     Plaintiff Ms. Gonzales is a resident of Bronx, New York, and a citizen of the State of New York.

7.     Plaintiff Ms. Potts is a resident of Cincinnati, Ohio, and a citizen of the State of Ohio.

8.     Plaintiff Ms. Theus is a resident of Hawthorne, California, and a citizen of the State of California.

9.     Defendant Lavander Lingerie, LLC ("LLL") is a Delaware limited liability company that, upon information and belief, operates "Savage X Fenty."  Its principal place of business and/or corporate headquarters are located at 800 Apollo Street, El Segundo, California 90245.  Upon information and belief, LLL's members (and/or managers) are Denise Albright and TechStyle, Inc., which, upon information and belief, is now named and/or (also) known as "TechStyle Fashion Group" and/or "TFG Holdings, Inc."[3]  Upon information and belief, Ms. Albright is a resident and citizen of California.  As discussed further below, *see infra* at ¶ 13, TechStyle, Inc. is a Delaware corporation with its principal place of business and/or corporate

---

[3]     *See* Assurance of Discontinuance, *In the Matter of TFG Holdings, Inc.* (Minn. Dist. Ct. Oct. 20, 2025), *available at* https://www.ag.state.mn.us/Office/ Communications/2025/docs/TFG-Holdings_AOD.pdf (last visited June 18, 2026), at ¶ 2.

4
CLASS ACTION COMPLAINT

headquarters, upon information and belief, located at 800 Apollo Street, El Segundo, California 90245.  Accordingly, LLL is a citizen of California and Delaware.

10.    Upon information and belief, (at a minimum) LLL does business as "Savage X Fenty," which is a joint venture between Rihanna and TechStyle Fashion Group (which, upon information and belief, was formerly named and/or (also) known as "TechStyle, Inc." and/or "TFG Holdings, Inc.").[4]

11.    Defendant Savage X, Inc. ("Savage X") is a California corporation with its principal place of business and/or corporate headquarters located at 800 Apollo Street, El Segundo, California 90245.  It is a citizen of California.  Upon information and belief, Savage X is involved in some manner with the operation of "Savage X Fenty."

12.    Defendant Savage X GC, LLC ("Savage X GC") is, upon information and belief, a Kentucky limited liability company.  Upon information and belief, its principal place of business and/or corporate headquarters are located at 1590 Rosencrans Avenue, Suite D62, Manhattan Beach, California 90266.  Upon information and belief, Savage X is the sole member of Savage X GC.  Accordingly, Savage X GC is a citizen of California.  Upon information and belief, Savage X GC is involved in some manner with the operation of "Savage X Fenty," including, but not necessarily limited to, the issuance and administration of at least certain gift cards.

13.    Defendant TechStyle Fashion Group ("TFG"),[5] which was formerly known as JustFab, Inc., was founded in 2010 in El Segundo, California.  Upon information and belief, the company was formerly named and/or (also) known as

---

[4]    *See*, *e.g.*, *infra* at ¶ 21.

[5]    Herein, "TFG" is defined to include TechStyle, Inc. and TFG Holdings, Inc. as well as TechStyle Fashion Group.

CLASS ACTION COMPLAINT

"TechStyle, Inc." and/or "TFG Holdings, Inc."  Its principal place of business and/or corporate headquarters are also located at 800 Apollo Street, El Segundo, California 90245.  Upon information and belief, TFG is a Delaware corporation.  Accordingly, TFG is, at a minimum, a citizen of California and Delaware.

14.    "Savage X Fenty" sells "an extensive assortment of lingerie, everyday basics, men's essentials, elevated sleep and loungewear – and, most recently, year-round bridal styles."[6]  It has retail stores in Yonkers, New York as well as in Atlanta, Georgia; Boston, Massachusetts; Washington, D.C.; Detroit, Michigan; Glendale, California; Houston, Texas; Los Angeles, California; Miami, Florida; New York, New York; Orland Park, Illinois; Philadelphia, Pennsylvania; St. Louis, Missouri; and Las Vegas, Nevada.  It also has a (domestic) website: www.savagex.com (the "Website").

15.    All critical decisions about and policies concerning, *inter alia*, (a) charging tariff-related fees and/or surcharges and (b) expiring Credits are and, at all relevant times, were, upon information and belief, made and/or set in California where the SXF Parties' corporate headquarters are located.[7]  Indeed, all but one of Defendants have their headquarters at the same street address, which, upon information and belief, is at least one of the locations from which they coordinate and conspire.[8]  Moreover, upon information and belief, California is where each of

---

[6]    "About Savage X Fenty," *Savage X Fenty*, https://www.savagex.com/about (last visited June 17, 2026) ("About").

[7]    *See*, *e.g.*, "Savage X Fenty," *highperformr*, https://www.highperformr.ai/company/savagexfenty (last visited June 17, 2026) ("SXFHQ") (stating that the "Savage X Fenty" headquarters "[s]erves as the central hub for Savage X Fenty's global operations, including product design and development, brand marketing, e-commerce management, retail strategy, and corporate functions").

[8]    SXFHQ, *supra* (observing that the "Savage X Fenty" headquarters is "the nerve center for [the] brand").

CLASS ACTION COMPLAINT

Defendants' top executives work and/or live, where the nexus or hub of the SXF Parties' relationship(s) is located, and even from where "Savage X Fenty" products are shipped to consumers. In other words, conduct that forms the basis of the claims set forth herein occurred in California.

16. The exact relationship(s) among LLL, Savage X, Savage X GC, and TFG is, upon information and belief, intentionally convoluted, vague, and/or obscured to prejudice and/or preclude an individual from determining, *inter alia*, the relationship(s) among them and/or the ownership, responsibility, liability, and operator of and/or for "Savage X Fenty," its retails stores, and/or the Website. Accordingly, in an abundance of caution and to avoid any "shell games," Plaintiffs are suing each and every of these entities now. Plaintiffs specifically reserve the right to amend this pleading and the defendants named herein based on discovery and/or other information learned hereafter.

## Jurisdiction and Venue

17. This Court has personal jurisdiction over each of the Defendants because, at a minimum, each of the SXF Parties' principal place of business is located in California; each regularly transacts business in California; each is at home in California and has continuous and systematic contacts with the state; each is a citizen of California; and/or as otherwise permitted by law.

18. This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332(d)(2) because this action is (i) a class action; (ii) in which the matter in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one member of the class of plaintiffs is a citizen of a state (*e.g.*, Illinois) different from all of the Defendants. This Court also has subject-matter jurisdiction (a)

CLASS ACTION COMPLAINT

pursuant 28 U.S.C. §1331 to the extent that this action arises under the laws of the United States and/or (b) as otherwise permitted by law.

19.    Venue is proper in this Court pursuant to, at least, 28 U.S.C. §1391(b)(2)-(3) because, *inter alia*, a substantial part of the events or omissions giving rise to the claim(s) occurred in this district and/or each Defendant is subject to personal jurisdiction in this district, and/or as otherwise permitted by law.

### Background

**_"Savage X Fenty" Generally_**

20.    "Savage X Fenty" "was [e]stablished in 2018 by Brand Visionary and Founder Rihanna."[9]

21.    "Although Rihanna is the founder of the namesake brand, Savage X Fenty is a joint business venture with TechStyle Fashion Group – the e-commerce force behind Kate Hudson's activewear brand Fabletics, the footwear company ShoeDazzle and the apparel company JustFab."[10]

22.    In 2022, "Savage X Fenty" opened its first brick-and-mortar store (in Las Vegas).[11]  Today, it has 14 physical stores, including ones in some of the biggest U.S. cities.[12]

---

[9]    About, *supra*.

[10]    Cortney Moore, "Rihanna's Savage X Fenty opens 1st store in Las Vegas as digital brands enter malls," *FoxBusiness* (Jan. 24, 2022), https://www.foxbusiness.com/lifestyle/rihanna-savage-fenty-1st-store-las-vegas (last visited June 17, 2026).

[11]    Moore, *supra*.

[12]    *See supra* at ¶ 14.

CLASS ACTION COMPLAINT

23.     "Savage X Fenty" also sells its products through the Website.  When purchasing online at least, customers, upon information and belief, may proceed either as a "guest" or as a "member."

24.     Upon information and belief, the Website and its "dark patterns"[13] are intentionally designed to (mis)lead unsuspecting consumers into joining the "Savage X Rewards Membership."  When a consumer visits the site, selects an item(s), and seeks to add the item(s) to the consumer's "bag," the consumer sees a display such as the following one:

[*Remainder of page intentionally left blank.*]

---

[13]  "Dark patterns, sometimes called deceptive patterns, are tricks designers use to make you do something that you didn't want to do, like signing up for a newsletter or visiting another website."  Justin Pot, "'Dark patterns' can ruin your online experience.  Here's how to avoid them.," *Popular Science* (July 2, 2023), *available at* https://www.popsci.com/diy/dark-patterns/ (last visited June 17, 2026).

9

CLASS ACTION COMPLAINT

The button to proceed as a "member" is highlighted and prominent.  It appears as the default option.  The "non-member" option is much less noticeable, not "pre-clicked," and would not appear as a viable option to a reasonable consumer.

25.    At checkout, a customer is also given the opportunity to add a "Rewards Membership" to the customer's "bag":[14]

---

[14]  Upon information and belief, "Savage X Fenty" may have just recently, *see infra* at 11 n.15, switched to providing a customer two Credits if the customer forgets to skip a month.  That change, if in fact it has occurred and/or taken effect, is immaterial to the relevant conduct and claims addressed herein.

10

CLASS ACTION COMPLAINT



26.     If the customer clicks "Add," the customer then sees:

27.     If, via either of the foregoing screens, the customer has, until very recently it seems,[15] clicked on "Learn More," the customer was presented with a "pop-up" screen with the headline "SAVAGE X REWARDS MEMBERSHIP." Therein, "Savage X Fenty" stated, in relevant part:[16]

---

[15]  To the extent that "Savage X Fenty" made changes to the Website and/or its policies, it, upon information and belief, has just done so literally within the last week.

[16]  Elsewhere on the Website, "Savage Fenty" seems to set forth another variation on the same theme:  "If you have signed up for the Membership on or after October 22, 2025, any unused Member Credits will expire after 12 months." However, as at least one online commenter noted that – as of *four years ago* – Credits were expiring after 12 months.  *See* "Are the Savage X Fenty member credits expiring a new thing," *reddit*, https://www.reddit.com/r/LingerieAddiction/comments/xu7ryo/are_the_savage _x_fenty_member_credits_expiring_a/ (last visited June 18, 2026) ("[W]hen going to skip this month, I saw that the credits are set to expire one year from

CLASS ACTION COMPLAINT

**Do Member Credits ever expire?**
No, Member Credits never expire. If you cancel your Membership, any unused Member Credits will remain in your account so you can come back and shop anytime. There are no refunds for unused Member Credits.

28.    Once signed up as a "member," an individual (today at least[17]) is billed $69.95 each and every month unless the individual chooses to "**'Skip the Month'** by the 5th of Each Month."[18]  According to the "Savage X Fenty" website:

# UNLOCK EVEN MORE
# REWARDS

Each month, you can unlock even more rewards for $69.95, including a **Member Credit** that that you can use towards your purchase of $69.95 or more! You get automatic entry into **surprise sweepstakes**— plus, with every 5th billing, you'll receive a **FREE underwear pack or bra**! Any unused Member Credits expire after 12 months.

---

their purchase.  I don't recall this being a thing, one reason why I was okay with the membership.  I like their stuff enough to be okay with the membership, but if I'd been aware that the credits expire (it's not like I'm always on a lingerie-buying binge), I doubt I would have signed up.  I'm having trouble searching for an answer, as most pages go to the company's FAQ or people complaining about the recurring membership costs rather than the supposed change in credits expiring.").

[17]  *See infra* at 12 n.18.

[18]  Upon information and belief, that amount has increased over the years – from $49.95 per month at one time to later $59.95 per month, and then to its current amount, $69.95 per month.

12

CLASS ACTION COMPLAINT

Upon information and belief, when a member cancels his membership, his or her Credits expire either immediately and/or after 12 months.

29. The statement by "Savage X Fenty" that "[a]ny unused Member Credits expire after 12 months" is unconscionable, unfair, a term of adhesion, violative of public policy, and unenforceable. It also contradicts an express promise made elsewhere on the Website, *see supra* at ¶ 27.

30. Upon information and belief, "Savage X Fenty" members routinely receive e-mail communication from "Savage X Fenty."

***Tariffs Generally***

31. "The definition of a tariff is fairly straightforward – it's a tax on goods coming from another country."[19]

32. Tariffs are imposed on the business importing the goods.[20] Tariffs are ***not*** imposed directly on consumers. That said, although "[i]mporters pay tariffs to

---

[19] Elisabeth Buchwald, "What is a tariff and how does it work," *CNN* (Feb. 4, 2025), https://www.cnn.com/2025/02/04/business/what-is-tariff-definition-meaning (last visited June 17, 2026). *See also*, *e.g.*, "Tariff," *Tax Foundation*, https://taxfoundation.org/taxedu/glossary/tariffs/ (last visited June 17, 2026) ("Tax Foundation") ("Tariffs are taxes imposed by one country on goods imported from another country."); Scott Nevil, "What Is a Tariff and Why Are They Important," *Investopedia* (May 10, 2026), https://www.investopedia.com/terms/t/tariff.asp (last visited June 17, 2026) ("A tariff is a tax imposed by one country on the goods and services imported from another country to influence it, raise revenues, or protect competitive advantages.").

[20] *See*, *e.g.*, Jennifer Clarke, "What tariffs has Trump introduced and why," *BBC News* (Feb. 24, 2026), https://www.bbc.com/news/articles/cn93e12rypgo (last visited June 17, 2026) ("The tax is paid to the government by companies bringing in the foreign products."); Buchwald, *supra* ("Domestic businesses that import products into the country pay the tariffs up front ….").

13

CLASS ACTION COMPLAINT

their home governments, … most economists find that the bulk of tariffs are passed on to consumers."[21]

33.     Tariffs cause an increase in prices of the goods on which tariffs have been placed as well as other goods into which the taxed goods are incorporated.[22] "While tariffs are often described as a tax on foreign businesses and do place an economic burden on foreign exporters, the costs are often borne by consumers in the country that is imposing them."[23]

34.     "Importers who pay the tax initially will typically raise prices to pass this additional cost along to consumers, known as 'price pass-through.'  The precise degree of pass-through will differ by good and sector:  It is driven largely by factors such as the degree of a company's market power and consumer sensitivity to price changes.  But ***substantial research convincingly demonstrates that it is U.S. households who ultimately pay for tariffs***."[24]

***The Trump Administration's 2025 Tariffs***

35.     "Shortly after taking office," the Supreme Court explained in *Learning Resources*, "President Trump sought to address two foreign threats.  The first was

---

[21] "What Are Tariffs*,"* *Council on Foreign Relations* (Apr. 1, 2025), https://www.cfr.org/backgrounders/what-are-tariffs (last visited June 17, 2026). *See also*, *e.g.*, Joseph Thorndike, "Who Pays Tariffs?  Mostly Consumers, But That Wasn't Always True," *Forbes* (Jan. 12, 2026), *available at* https://www.forbes.com/sites/taxnotes/2026/01/12/who-pays-tariffs-mostly-consumers-but-that-wasnt-always-true/ (last visited June 12, 2026) ("Experts tend[ed] to agree …, concluding that consumers [would] pay most of Trump's tariffs."); *infra* at ¶¶ 32-33.

[22] *See*, *e.g.*, Tax Foundation, *supra* ("Tariffs are trade barriers that raise prices ….").

[23] Tax Foundation, *supra*.

[24] Adam S. Hersh & Josh Bivens, "Tariffs – Everything you need to know but were afraid to ask," *Economic Policy Institute* (Updated March 28, 2025), *available at*

14
CLASS ACTION COMPLAINT

the influx of illegal drugs from Canada, Mexico, and China.  The second was 'large and persistent' trade deficits."[25]

36.    To address these threats, President Trump issued a series of Executive Orders, including (a) Executive Order 14193 ("Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border") (Feb. 1, 2025); (b) Executive Order 14194 ("Imposing Duties to Address the Situation at Our Southern Border) (Feb. 1, 2025); (c) Executive Order 14195 ("Imposing Duties To Address Synthetic Opioid Supply Chain in the People's Republic of China") (Feb. 1, 2025); and (d) Executive Order 14257 ("Regulating Imports With a Reciprocal Triff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits") (Apr. 2, 2025) ("E.O. 14257") (collectively, the "2025 Executive Orders").

37.    The purported authority for issuing the 2025 Executive Orders and imposing the tariffs established thereby was, *inter alia*, the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.* ("IEEPA"), which "provides the

---

https://www.epi.org/publication/tariffs-everything-you-need-to-know-but-were-afraid-to-ask/ (last visited June 17, 2026) (emphasis added).

[25] *Learning Res.*, 146 S. Ct. at 635-36 (citations omitted).  *See also* "A Year After 'Liberation Day,' Experts Review the Costs of Trump's Tariffs," *Council on Foreign Relations* (Apr. 2, 2026), https://www.cfr.org/articles/a-year-after-liberation-day-experts-review-the-costs-of-trumps-tariffs (last visited June 17, 2026) ("On April 2, 2025, [President] Trump … rais[ed] tariffs on nearly every U.S. trading partner to historic highs not seen since 1909.  That action brought the average effective tariff rate to 22.5 percent ….  Just seven days later, he reversed course, pausing the bulk of those tariffs for ninety days, leaving a 10 percent across-the-board tax on imports – while raising tariffs on China to … 125 percent.") (quoting Inu Manak); *infra* at ¶ 38.

CLASS ACTION COMPLAINT

President broad authority to regulate a variety of economic transactions following a declaration of national emergency."[26]

38.    After "imposing each set of tariffs," the Supreme Court explained, "the President has issued several increases, reductions, and other modifications.  One month after imposing the 10% drug trafficking tariffs on Chinese goods, he increased the rate to 20%.  One month later, he removed a statutory exemption for Chinese goods under $800.  Less than a week after imposing the reciprocal tariffs, the President increased the rate on Chinese goods from 34% to 84%.  The very next day, he increased the rate further still, to 125%.  This brought the total effective tariff rate on most Chinese goods to 145%.  The President has also shifted sets of goods

---

[26]  "The International Emergency Economic Powers Act:  Origins, Evolution, and Use," *Congressional Research Service* (Updated Sept. 1, 2025), *available at* https://www.congress.gov/crs_external_products/R/PDF/R45618/R45618.16.pd f (last visited June 12, 2025).  *See also*, *e.g.*, E.O. 14257 ("By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) (IEEPA) ….").

CLASS ACTION COMPLAINT

into and out of the reciprocal tariff framework.  And he has issued a variety of other adjustments."[27]

***Businesses Respond to Tariffs***

39.    To compensate for the 2025 Executive Orders and the tariffs they imposed, certain U.S. businesses raised prices of the goods onto which the tariffs were placed (and/or of goods into which the taxed goods were incorporated).[28]

40.    Indeed, as reported in October 2025, Goldman Sachs economists determined that "American consumers were shouldering 37% of the burden" of the new tariffs.[29]  At that time, the economists "assessed that by the end of 2025, U.S. consumers [would] be absorbing 55% of the tariff costs …."[30]

---

[27]  *Learning Res.*, 146 S. Ct. at 636 (citations omitted) (citing additional executive orders).  *See also supra* at 15 n.25.

[28]  *See, e.g.*, "Major brands from tech to fashion announce price hikes due to Trump's new tariffs:  Here's what will cost you more," *The Economic Times* (Apr. 20, 2025), https://economictimes.indiatimes.com/news/international/ us/major-brands-from-tech-to-fashion-announce-price-hike-due-to-trumps-new-tariffs-heres-what-will-cost-you-more/articleshow/120460851.cms (last visited June 17, 2026) ("A growing list of global firms has confirmed plans to raise prices in the U.S. market, citing the direct impact of newly introduced Trump's tariffs."); Ali McCadden, "Here are the retailers raising prices as Trump tariffs take hold," *CNBC* (May 31, 2025), https://www.cnbc.com/2025/05/31/trump-tariffs-here-are-the-retailers-raising-prices.html?msockid=1db8d62d7f996c2e 2ff0c0507e076d19 (last visited June 17, 2026) ("As they reported earnings in recent weeks, multiple major retailers said they have already raised some prices or plan to hike them in the coming weeks to offset the duties.").

[29]  Eric Revell, "US businesses and consumers shoulder the bulk of tariff cost burden, Goldman Sachs finds," *Fox Business* (Oct. 21, 2025), https://www.foxbusiness.com/economy/us-businesses-consumers-shoulder-bulk-tariff-cost-burden-goldman-sachs-finds (last visited June 17, 2026).

[30]  Revell, *supra*.

CLASS ACTION COMPLAINT

41.    While some U.S. businesses issued broad, general price increases, other U.S. businesses, such as "Savage X Fenty," "introduc[ed] 'tariff surcharges,' announcing new prices on their websites and in letters to consumers."[31]

***"Savage X Fenty's" Tariff-Related Fee(s) and/or Surcharge(s)***

42.    Upon information and belief, "Savage X Fenty" started charging in-store customers tariff-related fees and/or surcharges equal to 5.25 (and/or some other) percent of their purchase prices:[32]

---

[31]  Megal Cerullo, "Consumers now face 'tariff surcharges' for some goods as companies pass along costs," *CBS News* (Apr. 11, 2026), https://www.cbsnews.com/news/trump-tariff-surcharge-prices/ (last visited June 12, 2026). *See also*, *e.g.*, Aditi Shrikant, "CEO adds a 'Trump tariff surcharge' to products from China: 'I want people to understand how it impacts us,'" *CNBC* (Apr. 10, 2025), https://www.cnbc.com/2025/04/10/ceo-adds-a-trump-tariff-surcharge-to-products-from-china.html?msockid=1db8d62d7f996c2e2ff0c0507e076d19 (last visited June 17, 2026) ("Dame, a sexual wellness brand, is putting what it calls a 'Trump tariff surcharge' of $5 on all vibrators, which it imports from China."); *infra* at ¶¶ 42-47.

Unlike "Savage X Fenty," Dame Products, Inc., which imposed a "Trump Tariff Surcharge" on products sold after President Trump issued the 2025 Executive Orders, is refunding the additional amounts it collected.  *See* "Why We're Refunding The Trump Tariff Surcharge," *Dame*, https://dame.com/pages/trump-tariff-refund (last visited June 17, 2026) ("If you were charged our Trump Tariff Surcharge, you will receive an automatic refund.").

[32]  *See* "Tariff Tax??," *Facebook* (Nov. 11, 2024), https://www.facebook.com/groups/lasvegasanythinglocal/posts/what-is-this-525-tariff-tax-at-the-savage-x-fenty-store-in-the-fashion-show-mall/9240528385971030/ (last visited June 4, 2026). *See also, e.g., infra* at ¶¶ 87-88.  (It appears that, recently, the "owner" of the Facebook post, which had been publicly available, changed who can see it or deleted it.)

18

CLASS ACTION COMPLAINT

| Subtotal | $132.35 |
| Tax (8.37%) | $11.67 |
| Tariff (5.25%) | $6.94 |
| Total | $150.96 |

43.    "Savage X Fenty" also charged tariff-related fees and/or surcharges to online purchasers.

44.    "Savage X Fenty" deceptively referred to that online fee and/or surcharge as an "Import Tax":

| ORDER SUMMARY | |
| --- | --- |
| Subtotal | $59.95 |
| Endowment Credits | $0.00 |
| Shipping | Free |
| Import Tax | $5.26 |
| Tax (Sales) | $5.70 |
| Member Credit | -$59.95 |
| Total | $10.96 |

45.    However, "[a] tax is a mandatory payment or charge collected by local, state, and national governments from individuals or businesses to cover the costs of general government services, goods, and activities."[33]  This tariff-related fee and/or surcharge charged by "Savage X Fenty" most certainly was *not* a tax.  It was *not* mandated by the government.  It was *not* collected by the government.  And, it was *not* intended to cover the costs of any government services, goods, or activities.

---

[33] "Tax," *Tax Foundation*, https://taxfoundation.org/taxedu/glossary/tax/ (last visited June 17, 2026).

CLASS ACTION COMPLAINT

46.    If an online consumer clicked to learn more about the so-called "Import Tax," "Savage X Fenty" stated:



47.    Regardless, upon information and belief, "Savage X Fenty" did **not** disclose this tariff-related fee and/or surcharge, which was **not** part of the advertised price of any product, to any consumer until **after** the consumer was deep into the purchasing process.

**"Drip Pricing" and "Junk Fees"**

48.    The addition of this extra, unexpected, last-minute "tariff surcharge to [a customer's] product cost" is a quintessential example of drip pricing and/or the imposition of a junk fee.

CLASS ACTION COMPLAINT

49.    "Drip pricing" is "[a] pricing technique in which firms advertise only part of a product's price and reveal other charges later as consumers go through the buying process."[34]

50.    Colloquially, "[a] junk fee is an unexpected and sometimes hidden fee a company charges consumers for a service that often costs it little to provide."[35]

51.    Although "[m]ost Americans are unfamiliar with terms like 'ancillary revenue,' 'shrouded attributes,' or 'partitioned pricing[,]' … we're all well acquainted with the feeling that we've been scammed, tricked, or flat-out deceived when shopping for products and services.  That's why the phrase 'junk fees,' coined by Consumer Financial Protection Bureau (CFPB) director Rohit Chopra, makes intuitive sense, even if you're just hearing it for the first time.  The fact that 'fees' almost always refer to non-optional costs was an important factor in settling on that descriptor, Chopra [explained]."[36]

52.    As the FTC stated, when announcing "a final Junk Fee Rule to prohibit bait-and-switch pricing and other tactics used to hide total prices and bury junk fees

---

[34]  Mary Sullivan, "Overview of Drip Pricing" (May 21, 2012), *available at* https://www.ftc.gov/sites/default/files/documents/public_events/economics-drip-pricing/msullivan.pdf (last visited June 17, 2026).

[35]  Beth Braverman & Erica Sandberg, "What Is a Junk Fee and How Does it Affect You?," *U.S. News & World Report* (June 12, 2026), *available at* https://money.usnews.com/money/personal-finance/spending/articles/what-are-junk-fees-and-how-do-they-affect-you (last visited June 17, 2026).

[36]  Hassan Ali Kanu, "Loaded Up With Junk," *The American Prospect* (June 6, 2024), *available at* https://prospect.org/2024/06/06/2024-06-06-loaded-up-with-junk/ (last visited June 17, 2026).

CLASS ACTION COMPLAINT

in the live-event ticketing and short-term lodging industries[,] ***[t]hese unfair and deceptive pricing practices harm consumers and undercut honest businesses***."[37]

**Learning Resources v. Trump**

53.    On February 20, 2026, the Supreme Court, in an opinion authored by Chief Justice Roberts, struck down the tariffs imposed by the 2025 Executive Orders, finding that IIEPA did not empower the President to impose the tariffs.

54.    The Court explained:

> [T]the Government reads IEEPA to give the President power to unilaterally impose unbounded tariffs.  On this reading, moreover, the President is unconstrained by the significant procedural limitations in other tariff statutes and free to issue a dizzying array of modifications at will.  All it takes to unlock that extraordinary power is a Presidential declaration of emergency, which the Government asserts is unreviewable.  And the only way of restraining the exercise of that power is a veto-proof majority in Congress.  That view, if credited, would "represent[] a 'transformative expansion'" of the President's authority over tariff policy, and indeed – as demonstrated by the exercise of that authority in this case – over the broader economy as well.   It would replace the longstanding executive-legislative collaboration over trade policy with unchecked Presidential policymaking.[38]

55.    In the end, the Court rejected that argument:

---

[37] "Federal Trade Commission Announces Bipartisan Rule Banning Junk Ticket and Hotel Fees," *Federal Trade Commission* (Dec. 17, 2024), *available at* https://www.ftc.gov/news-events/news/press-releases/2024/12/federal-trade-commission-announces-bipartisan-rule-banning-junk-ticket-hotel-fees (last visited June 17 2026) (emphasis added). *See also*, *e.g.*, *id.* ("'People deserve to know up-front what they're being asked to pay – without worrying that they'll later be saddled with mysterious fees that they haven't budgeted for and can't avoid,' said FTC Chair Lina M. Khan.").

[38] *Learning Res.*, 146 S. Ct. at 640 (citations omitted).

CLASS ACTION COMPLAINT

The President asserts the extraordinary power to unilaterally impose tariffs of unlimited amount, duration, and scope. In light of the breadth, history, and constitutional context of that asserted authority, he must identify clear congressional authorization to exercise it.

IEEPA's grant of authority to "regulate ... importation" falls short. IEEPA contains no reference to tariffs or duties. The Government points to no statute in which Congress used the word "regulate" to authorize taxation. And until now no President has read IEEPA to confer such power.

We claim no special competence in matters of economics or foreign affairs. We claim only, as we must, the limited role assigned to us by Article III of the Constitution. Fulfilling that role, we hold that IEEPA does not authorize the President to impose tariffs.[39]

### Tariff Refunds

56. Thereafter, "[a] U.S. trade court judge … ordered the government to begin paying potentially billions of dollars in refunds to importers who paid tariffs that the Supreme Court said … were collected illegally. Judge Richard Eaton of the U.S. Court of International Trade in Manhattan … ordered the refunds to be made with interest."[40]

57. Specifically, on March 4, 2026, Judge Eaton entered an Order in *Atmus Filtration, Inc. v. United States*, No, 26-01259 (Ct. Int'l Trade Mar. 4, 2026), which

---

[39] *Learning Res.*, 146 S. Ct. at 646.

[40] "Judge orders U.S. Customs to process refunds on illegal Trump tariffs," *CNBC* (Mar. 4, 2026), https://www.cnbc.com/2026/03/05/judge-orders-us-customs-to-process-refunds-on-illegal-trump-tariffs.html (last visited June 17, 2026). *See also, e.g.*, Danielle Kaye, "US trade court orders tariff refunds in setback for Trump administration," *BBC* (Mar. 4, 2026), https://www.bbc.com/news/articles/c1d66k5r1x4o (last visited June 17, 2026) (reporting that, in March 2026, Judge Eaton "ordered [CBP] to issue refunds for levies US President Donald Trump introduced last year under the International Emergency Economic Powers Act (IEEPA)").

CLASS ACTION COMPLAINT

ordered "that, with respect to any and all unliquidated entries that were entered subject to the IEEPA duties, U.S. Customs and Border Protection [('CBP')] is hereby directed to liquidate those entries without regard to the IEEPA duties. Any liquidated entries for which liquidation is not final shall be reliquidated without regard to IEEPA duties."[41]

58.    On March 27, 2026, Judge Eaton entered another Order in the same case, amending his prior Order(s). "The amended order now includes similar instruction for finally liquated entries, with the Court directing CBP to reliquidate such entries 'without regard' for IEEPA tariffs …."[42]

59.    Accordingly, the Trump Administration implemented a process by which it would refund to businesses the tariffs it had collected illegally.[43]  On or about April 20, 2026, CBP "launch[ed] the first phase of the Consolidated Administration and Processing of Entries (CAPE) tool in the Automated Commercial Environment Secure Data Portal (ACE Portal).  CAPE [is intended to] simplify International Emergency Economic Powers Act (IEEPA) duty refund requests made pursuant to court order and in accordance with appropriate statutory

---

[41]  Order, *Atmus Filtration, Inc. v. United States*, No, 26-01259 (Ct. Int'l Trade Mar. 4, 2026), *available at* https://storage.courtlistener.com/recap/gov.uscourts. cit.19346/gov.uscourts.cit.19346.21.0_2.pdf (last visited June 17, 2026).

[42]  Phil Neuffer, "Tariff refunds:  Court expands scope to include finally liquidated entries," *SupplyChainDive* (Mar. 30, 2026), *available at* https://www.supplychaindive.com/news/tariff-refunds-cit-expands-scope-finally-liquidated-entries/816080/ (last visited June 17, 2026).

[43]  "Everyday people can't use it to apply for refunds, even though tariffs cost the average American household $1,000 in 2025."  Peter Grieve, "We asked 19 Companies if They Plan to Give Customers Tariff Refunds.  Only 3 Replied," Money (Apr. 22, 2026), *available at* https://money.com/companies-giving-tariff-refunds/ (last visited June 17, 2026).

authority by providing an electronic pathway to submit valid IEEPA duty refund claims."[44]

60. CBP explains, *inter alia*:

U.S. Customs and Border Protection (CBP) will issue validated refunds for duties paid under the International Emergency Economic Powers Act (IEEPA). Declarations are submitted and processed using the new Consolidated Administration and Processing of Entries (CAPE) tool, which enables batch handling of IEEPA duty refunds.[45]

61. By April 26, 2026, more than 75,000 refund requests already had been made.[46] "As of May 11, [2026,] the CBP had already received over 126,000 applications covering 15.1 million qualifying entries. Among those entries, 8.3 million shipments have been fully processed. The anticipated total payout for those finalized cases alone – including interest – stands at $35.46 billion. That number,

---

[44] U.S. Customs and Border Protection, "Consolidated Administration and Processing of Entries (CAPE) Phase 1" (Last updated: Apr. 8, 2026), *available at* https://www.cbp.gov/sites/default/files/2026-04/trade_information_notice_cape_508c.pdf (last visited June 17, 2026).

[45] U.S. Customs and Border Protection, "IIEPA Duty Refunds Fact Sheet," *available at* https://www.cbp.gov/sites/default/files/2026-04/ieepa_refunds_factsheet_0.pdf (last visited June 17, 2026).

[46] *See* Megan Cerullo, "Feds have rejected 15% of businesses' tariff refund claims," *CBS News*, https://www.cbsnews.com/news/tariff-refund-portal-trump-cbp/ (last visited June 17, 2026) ("As of April 26, [CBP] had received more than 75,000 refund requests from U.S. businesses and other importers. More than 47,000 claims encompassing some 11 million tariff payments were properly filed, CBP official Brandon Lord said in a filing with the Court of International Trade on Tuesday.").

CLASS ACTION COMPLAINT

confirmed in a court filing by a senior CBP official, signals the sheer scale of what is already in motion."[47]

62.    Upon information and belief, the identities of those businesses that have applied for and/or received refunds are not publicly disclosed or available.  The only way to know, therefore, whether a business has in fact applied for or received a refund is, upon information and belief, if the business itself makes some public statement to that effect.

63.    Although consumers largely paid for the tariffs, they are ***not*** likely to realize any benefit from the refunds:

> Consumers hoping for relief from potential tariff refunds are unlikely to see any meaningful financial benefit as companies signal they intend to keep any repayments rather than pass them through to households, according to the latest CNBC CFO Council survey.
>
> …
>
> The CNBC CFO Council survey, which polled chief financial officers at large U.S. companies between March 23 and April 2, showed that 12 out of 25 executives said their firms would apply for tariff refunds.
>
> However, ***none of those surveyed indicated that they plan to pass any portion of those refunds on to customers***.  On the same note, six respondents said they would not share any of the funds at all, while

---

[47]  Piyush Shukla, "Trump tariff refund checks begin disbursing this week – who qualifies and why are millions excluded from payouts," *The Economic Times* (May 14, 2026), https://economictimes.indiatimes.com/news/international/us/trump-tariff-refund-checks-begin-disbursing-this-week-who-qualifies-and-why-are-millions-excluded-from-payouts/articleshow/131093826.cms    (last visited June 17, 2026).

CLASS ACTION COMPLAINT

seven remained uncertain, and 12 said the issue was not applicable to their operations.[48]

64.    In other words, businesses, who received and appreciated significant benefits from their customers, will end up with a windfall at those consumers' expense.  Businesses collected money – in the form of price increases, fees, and/or surcharges – from consumers to pay for the tariffs imposed on the businesses.  While the (often explicit) representation(s) that the increase, fee, and/or charge was as a result of, due to, and/or intended to offset any or all of the tariffs may technically have been true at the time it was made, the tariffs ultimately were held to be illegal.  As such, businesses are eligible for a refund of amounts they paid in tariffs.  Whether any business chooses to apply for a refund is its choice – after all, the tariffs were imposed on businesses (not consumers).  However, businesses voluntarily and intentionally decided to pass on the cost of those tariffs to consumers.[49]

*"Savage X Fenty's" Response to Available Refunds*

65.    The SXF Parties are entitled to seek a refund(s) of the tariffs imposed by the 2025 Executive Orders that they paid and passed on to 'Savage X Fenty'

---

[48]  Merin Rebecca Thomas, "Tariff Refunds Set To Bypass Consumers As Companies Keep Payouts, CFO Survey Finds," *International Business Times* (Apr. 13, 2026), *available at* https://www.ibtimes.com/tariff-refunds-set-bypass-consumers-companies-keep-payouts-cfo-survey-finds-3801186 (last visited June 17, 2026) (emphasis added).  *See also*, *e.g.*, Rachel Barber, "Businesses are getting tariff refunds.  Will consumers see any money?," *USA Today* (Apr. 30, 2026), *available at* https://www.usatoday.com/story/money/2026/04/30/business-tariff-refund-consumers-prices/89871794007/ (last visited June 12, 2026) ("While companies shouldered much of the tariff costs, at least some were passed to shoppers through higher shelf prices.  Still, consumers aren't likely to see direct refunds or lower prices across the board, according to Jackson Wood, director of industry strategy for Descartes' Global Trade Intelligence business unit.").

[49]  *See also infra* at 28 n. 50.

27

CLASS ACTION COMPLAINT

customers by way of tariff-related fees and/or surcharges they charged between and including (at least) April 2, 2025 and February 20, 2026.

66. Upon information and belief, the SXF Parties have **not** stated publicly that they have applied for any refund(s). As such, it is currently unknown whether they are seeking and/or have filed for a refund(s) of the illegal tariffs they paid.[50]

67. Upon information and belief, "Savage X Fenty" has **not** stated publicly that it intends to provide any consumer(s) any refund(s) for any extra amount(s) a consumer(s) paid for any good(s) as a result of, due to, and/or to offset any or all of the illegal tariffs imposed by the 2025 Executive Orders.

68. Upon information and belief, "Savage X Fenty" has not refunded or returned to consumers the extra amounts they paid – in the form of fees and/or surcharges – for any goods as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders.

***Ongoing Tariff Charges***

69. Although the tariffs imposed by the 2025 Executive Orders were struck down months ago, "Savage X Fenty" continues to charge its customers a surprise,

---

[50] Whether the SXF Parties have requested, and/or will seek, a refund(s) from the United States for the tariffs "Savage X Fenty" paid is **immaterial**. The SXF Parties have the legal right to do so; whether they choose to request a refund(s) is their choice. Regardless whether they seek and/or obtain a refund(s), they have obtained a benefit(s) from consumers – that is, the extra amounts charged to and paid by consumers as a result of, due to, and/or to offset any or all of the tariffs – and it would be unjust for the SXF Parties to retain that benefit(s) now that the tariffs have been declared illegal. Of course, if the SXF Parties do obtain a refund(s) without issuing a corresponding refund(s) to its customers, its conduct would be that much more egregious, and the retention of those amounts would be that much more unjust. It would constitute worse "double recovery." To be clear, though, the receipt of a refund(s) by any of the SXF Parties is **not** a condition of Plaintiffs' recovery here. Regardless, the SXF Parties are experiencing a windfall. *See, e.g., supra* at ¶ 64.

CLASS ACTION COMPLAINT

hidden "tariff" fee and/or surcharge, which, upon information and belief, is only disclosed late in the checkout process:



70.    This tariff-related fee and/or surcharge still is not included in the advertised price of any good.  Nor is it disclosed to the consumer upfront.  Instead, the fee and/or surcharge is only first disclosed late in the checkout process.

71.    Upon information and belief, at least in certain instances, "Savage X Fenty" continues to deceitfully represent its tariff-related fee(s) and/or surcharge(s) as a tax:

| SUBTOTAL | $79.95 |
| VIP SAVINGS | −$49.90 |
| MEMBER CREDITS | −$69.95 |
| ORDER DISCOUNTS | −$5.00 |
| SHIPPING | $0.00 |
| TARIFF TAX ⓘ | $7.00 |
| TAX | $0.00 |
| **TOTAL** | **$12.00** |

Once again, though, this tariff-related fee and/or surcharge is ***not*** a tax.  *See, e.g., supra* at ¶ 45.

72.    Regardless, now, if an online consumer clicks to learn more about this charge, "Savage X Fenty" provides the following explanation of its ongoing "tariff surcharge":



***Plaintiffs' Experiences***

73.    Ms. Maxwell is a "Savage X Fenty" member.  As such, since becoming a member in 2020, she has been charged a monthly fee unless she expressly opted out of the program/charge for that specific month.

74.    On or about August 2, 2025, Ms. Maxwell purchased a series of "Savage X Fenty" products.  The price of the items she chose to purchase was $59.95.  In addition, she was charged $5.70 in "Tax (Sales)" and $5.26 in "Import Tax":

CLASS ACTION COMPLAINT

56

**Order Details**

### ORDER SUMMARY

| | |
|---|---|
| Subtotal | $59.95 |
| Endowment Credits | $0.00 |
| Shipping | Free |
| Import Tax ⓘ | $5.26 |
| Tax (Sales) | $5.70 |
| Member Credit | -$59.95 |

| | |
|---|---|
| **Total** | **$10.96** |

### BILLING INFORMATION

VISA

**** **** **** 7473
Ebonie Maxwell
Expires 05/2029

75.    Although a "Member Credit" of $59.95 was applied to cover the cost of the items themselves, Ms. Maxwell was still charged and paid $10.96 for the "Tax (Sales)" and the (so-called) "Import Tax," which is and/or was just another name for "Savage X Fenty's" "Tariff Surcharge."

76.    Ms. Maxwell's purchases were shipped from California to Illinois via DHL and ultimately delivered to Ms. Maxwell in Illinois on or about August 12, 2026.

77.    At other times, Ms. Maxwell has had her unused Credits – for which she had already paid – expire.  Defendants are in possession of the information

31

CLASS ACTION COMPLAINT

and/or documentation necessary to determine the exact purchase and expiration dates, as well as the value, of Ms. Maxwell's Credits.

78. Ms. Gonzalez, a "Savage X Fenty" member, purchased "Savage X Fenty" products on or about April 9, 2026 and May 12, 2026 – well after the Supreme Court struck down the tariffs imposed by the 2025 Executive Orders. Nonetheless, on both occasions, Ms. Gonzalez was charged and paid a so-called "Tariff Tax."

79. With respect to her April 9, 2026 purchase, Ms. Gonzalez was charged and paid a $7.00 "Tariff Tax":



\*\*\*

CLASS ACTION COMPLAINT



80.     With respect to her May 12, 2026 purchase, Ms. Gonzalez was charged and paid a $13.25 "Tariff Tax":



***

33

CLASS ACTION COMPLAINT

| SUBTOTAL | $250.65 |
| VIP SAVINGS | -$188.64 |
| MEMBER CREDITS | -$139.90 |
| ORDER DISCOUNTS | -$109.69 |
| SHIPPING | $0.00 |
| TARIFF TAX ⓘ | $13.25 |
| TAX | $0.00 |
| **TOTAL** | **$14.31** |

SHIPPING INFO

JESSICA GONZALEZ

81.     "Savage X Fenty" provides the same explanation for the "Tariff Tax" added to each of Ms. Gonzalez's two recent purchases.  For example, when asked to show more information about the so-called tax charged for her April 9, 2026 purchases, "Savage X Fenty" displays:[51]

| SUBTOTAL | $250.65 |
| VIP SAVINGS | -$188.64 |
| MEMBER CREDITS | -$139.90 |
| ORDER DISCOUNTS | -$109.69 |
| SHIPPING | $0.00 |
| TARIFF TAX ⓘ | $13.25 |
| TAX | .00 |

**TARIFF SURCHARGE**

Recent changes to tariff policy have increased the cost of importing goods. To ensure the quality of apparel you've come to trust from Fabletics, we've implemented a small percentage tariff surcharge. Thank you for your understanding and support as we navigate this industry-wide challenge together.

TOT                                                                 .31

SHIP

JESSICA GONZALEZ

---

[51] Of course, contrary to any suggestion otherwise in the screen shown, Ms. Gonzalez made her purchase(s) from "Savage X Fenty" – *not* Fabletics.  Upon information and belief, the mistaken reference to "Fabletics" is likely a result of THG's involvement, as well as its relationship with other companies, including Fabletics.  *See*, *e.g.*, *supra* at ¶ 21.  This mistake is immaterial, however, as the explanation of the surcharge provided is similar in all relevant respects to the explanation otherwise available on the Website and/or elsewhere online.  *See*, *e.g.*, *supra* at ¶ 72.

CLASS ACTION COMPLAINT

82.     Ms. Gonalez's purchases were shipped via DHL to her home in New York from, upon information and belief, California.

83.     Beginning at least in 2023, Ms. Potts also was a "Savage X Fenty" member.  Like Ms. Maxwell, she was charged and paid, on more than one occasion, the monthly charge.  By Spring 2025, Ms. Potts had amassed approximately two to four unused Credits.

84.     In or about March or April 2025, Ms. Potts, who was then still a "Savage X Fenty" member, discovered that she no longer had access to the Credits for which she had paid.  Upon information and belief, "Savage X Fenty" had caused those unused Credits to expire.  Defendants are in possession of the information and/or documentation necessary to determine the exact purchase and expiration dates, as well as the value, of Ms. Potts' Credits.

85.     Understandably upset, Ms. Potts cancelled her "Savage X Fenty" membership in or about March or April 2025.

86.     "Savage X Fenty" made it exceedingly difficult for Ms. Potts to cancel her membership.  When she called "Savage X Fenty" to cancel, Ms. Potts was kept on hold for a lengthy duration and repeatedly transferred among various "Savage X Fenty" representatives.  She was on the phone with "Savage X Fenty" for approximately one hour in order to cancel her membership, which she ultimately was able to do.

87.     On or about April 7, 2025, Ms. Theus made an in-person purchase from the "Savage X Fenty" store in the Westfield Culver City mall, which was then known as the Fox Hills Mall, in Culver City, California.  Defendants are in possession of the information and/or documentation necessary to determine how the price that Ms. Theus paid for her purchase that day was calculated, including, but not limited to, the specific amount of the tariff-related fee and/or surcharge she was charged and paid.

CLASS ACTION COMPLAINT

88.    When Ms. Theus made her in-store purchase, she was in fact charged and paid an additional, unexpected "tariff" fee and/or surcharge.  This fee and/or surcharge was not disclosed to her until late in the purchasing process – after her items were rung up and the final amount was displayed at checkout.  Furthermore, upon information and belief, there was no signage or other indication in the store that she would be charged such a fee and/or surcharge in addition to the advertised price(s) of the goods.

89.    When Ms. Theus asked a "Savage X Fenty" employee about the purpose of this fee and/or surcharge, she was misleadingly told that it was a city or local tax of some sort.  It was **not** a tax, however.  *See*, *e.g.*, *supra* at ¶ 45.

90.    Ms. Theus was also a "Savage X Fenty" member from in or about 2024 until approximately January 2026.  She decided to cancel her membership when, at a minimum, "Savage X Fenty" continued to charge her a monthly membership fee even though she had "paused" her membership.

91.    Ms. Theus had to call "Savage X Fenty" approximately five different times in an effort to cancel her membership.  "Savage X Fenty" made it very difficult for her to cancel.  Its telephone representative(s) repeatedly attempted to talk her out of cancelling; ultimately, in order to cancel, she was made to speak with a manager.  Her experience, upon information and belief, was not unique.

92.    In addition, Ms. Theus also had certain unused Credits expire.  Once again, Defendants are in possession of the information and/or documentation necessary to determine the exact purchase and expiration dates, as well as value, of Ms. Theus' Credits.

## Class Allegations

93.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this class action on behalf of themselves and all other individuals who are similarly situated.

CLASS ACTION COMPLAINT

94. Plaintiffs Ms. Maxwell and Ms. Theus seek to represent a class of persons to be defined as follows:

> All "Savage X Fenty" customers who were charged a fee(s) and/or surcharge(s) by Defendants between and including (at least) April 2, 2025 and February 20, 2026 as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders (the "Pre-February 20 Tariff Class").

95. In addition, Plaintiff Ms. Gonzalez seeks to represent a class of persons to be defined as follows:

> All "Savage X Fenty" customers who were charged a tariff-related fee(s) and/or surcharge(s) by Defendants after February 20, 2026 (the "Post-February 20 Tariff Class").

96. Additionally, Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Theus seek to represent a class of persons to be defined as follows:

> All "Savage X Fenty" customers who had a non-zero balance of Credits that Defendants caused to expire within the relevant statute of limitations (the "Gift Card Class").

97. Furthermore, Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Gonzalez seek to represent a class of persons to be defined as follows:

> All individuals who became or remained a "Savage X Fenty" member within the relevant statute of limitations (the "Membership Class").

98. Further still, Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Gonzalez seek to represent a class of persons to be defined as follows:

> All individuals who became or remained a "Savage X Fenty" member and/or made an online purchase(s) from "Savage X Fenty" within the relevant statute of limitations (the "RICO Class").

CLASS ACTION COMPLAINT

99.   Specifically excluded from the Pre-February 20 Tariff Class, the Post-February 20 Tariff Class, the Gift Card Class, the Membership Class, and the RICO Class are (a) Defendants; (b) any of their parents, subsidiaries, affiliates, divisions, predecessors, successors, or any other entities they legally control; (c) each of their officers, directors, members, agents, trustees, employees, principals, servants, partners, or representatives, as well as each of their parents, spouses, children, trusts, heirs, successors, and assigns; and (d) the judicial offer to whom this case is assigned, as well as his or her parents, spouses, children, trusts, heirs, successors, and assigns.

100.   Subject to additional information obtained through further investigation and/or discovery, Plaintiffs reserve the right to amend, narrow, or expand the class definitions.

101.   *Numerosity:* Each of the classes, *i.e.*, the Pre-February 20 Tariff Class, the Post-February 20 Tariff Class, the Gift Card Class, the Membership Class, and the RICO Class is so numerous that joinder of all members in any of the classes is impracticable.  Although the precise number of members of each class are unknown to Plaintiffs at this time, they are likely to number in the thousands (if not more) given the amount of sales that "Savage X Fenty" completes annually.[52]  The names and addresses of all affected individuals are known to Defendants and can be

---

[52] According to at least one source, "Savage X Fenty" had U.S. $177 million in revenue in 2025.  *See* "Savage x Fenty Company & Revenue," *ECDB*, https://ecdb.com/resources/sample-data/retailer/savage-x-fenty (last visited June 17, 2026).  *See also*, *e.g.*, "Savage X Fenty," *Femfounded*, https://femfounded.org/case-studies/savage-x-fenty/ (last visited June 12, 2026) (estimating "Savage X Fenty's" annual revenue at approximately $150 million).  Upon information and belief, "Savage X Fenty" does not publicly disclose the number of "members" it has, but that number is also assumed to be in the thousands (if not more) given the company's significant focus on its "Savage X Rewards Membership" program.

CLASS ACTION COMPLAINT

identified through Defendants' records.  Members of each class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

102.  *Commonality:*  There are questions of law and/or fact that are common across the various classes, *i.e.*, the Pre-February 20 Tariff Class, the Post-February 20 Tariff Class, the Gift Card Class, the Membership Class, and the RICO Class. For example, factual questions concerning the management and control of "Savage X Fenty," the operation of the Website, and the "Savage X Fenty" business model are common to the members of each class.  There are also common questions of law and fact within each of the five classes respectively.  For example:

    a)    *Pre-February 20 Tariff Class:*  Common questions of law and fact within the Pre-February 20 Tariff Class include, but are not limited to, the following:

- Did Defendants advertise, display, or offer a price(s) for a good(s) that did not include all fees and/or charges?

- Did the imposition of surprise, hidden tariff-related fees and/or surcharges by Defendants constitute an unfair, unlawful, and/or fraudulent business act(s) and/or practice(s)?

- Did mislabeling the surprise, hidden tariff-related fee(s) and/or a surcharge(s) imposed by Defendants a "tax" constitute an unfair, unlawful, and/or fraudulent business act(s) and/or practice(s)?

- Did Defendants' failure to refund consumers the amounts they were charged and paid as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders constitute an

39

unfair, unlawful, and/or fraudulent business act(s) and/or practice(s)?

- Did Defendants' use of junk fees and drip pricing (to add tariff-related fees and/or surcharges) violate the public policy of the State of California?

- Did consumers confer a benefit(s) on Defendants by paying the deceptive, misleading, hidden, and surprise tariff-related fees and/or surcharges?

- Were Defendants authorized to charge, collect, and/or assume control over the money that consumers paid as tariff-related fees and/or surcharges (at least in the manner that Defendants did so)?

- Would it be unjust and/or inequitable for Defendants to retain the tariff-related fees and surcharges that they charged and collected from consumers as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders, especially after the Supreme Court ruled that those tariffs were illegal?

- Should the money that consumers were charged and paid to Defendants as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders be returned to consumers?

- Is a business seeking and/or receiving a refund from the federal government for amounts paid as a result, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders a condition, precondition, or prerequisite for a consumer(s) being able to seek and/or receive a refund(s) of any amounts the consumer paid to a business as a result, due to, and/or to offset any or all of those tariffs?

40

CLASS ACTION COMPLAINT

b) *Post-February 20 Tariff Class:*  Common questions of law and fact within the Post-February 20 Tariff Class include, but are not limited to, the following:

- Did Defendants advertise, display, or offer a price(s) for a good(s) that did not include all fees and/or charges?

- Did the imposition of surprise, hidden tariff-related fees and/or surcharges by Defendants constitute an unfair, unlawful, and/or fraudulent business act(s) and/or practice(s)?

- Did mislabeling the surprise, hidden tariff-related fee and/or a surcharge imposed by Defendants a "tax" constitute an unfair, unlawful, and/or fraudulent business act(s) and/or practice(s)?

- Did Defendants' use of junk fees and drip pricing (to add tariff-related fees and/or surcharges) violate the public policy of the State of California?

- Did consumers confer a benefit(s) on Defendants by paying the deceptive, misleading, hidden, and surprise tariff-related fees and/or surcharges?

- Were Defendants authorized to charge, collect, and/or assume control over the money that consumers paid as tariff-related fees and/or surcharges (at least in the manner that Defendants did so)?

c) *Gift Card Class:*  Common questions of law and fact within the Gift Card Class include, but are not limited to, the following:

- Do the Credits that Defendants provide to consumers constitute a "gift certificate" under applicable law?

41

CLASS ACTION COMPLAINT

- Did Defendants violate California's Gift Card Law by making unused Credits expire 12 months after purchase (if not sooner)?

- Did consumers confer a benefit(s) on Defendants by paying a monthly charge in exchange for a promise(s) to be able to use Credits equal to the value of that charge(s) for a later purchase(s) at "Savage X Fenty"?

- Is it unjust and/or inequitable for Defendants to retain that benefit(s) conferred on them by consumers?

- At the time that Defendants made Credits expire, did consumers have a legal right to the Credits and/or the value thereof?

- Have Defendants wrongfully deprived consumers of their Credits and the value associated therewith by making the Credits expire 12 months after purchase (if not sooner)?

- Did Defendants breach their contract(s) (or implied contract(s)) with consumers by making Credits expire 12 months after purchase (if not sooner)?

- To the extent that one of the terms in the contract(s) (or implied contract(s)) between Defendants and consumers purportedly was that unused Credits would expire after 12 months, is that term unconscionable, void, and/or otherwise unenforceable?

- Did Defendants breach the implied covenant of good faith and fair dealing, which is included in every California contract, by making Credits expire 12 months after purchase (if not sooner)?

42

CLASS ACTION COMPLAINT

d)      *Membership Class:*  Common questions of law and fact within the Membership Class include, but are not limited to, the following:

- Does "Savage X Fenty" make an automatic renewal offer(s) or continuous service offer(s) to consumers, including consumers in California?

- Is the "Savage X Fenty" membership a continuous service?

- On the Website, do Defendants present the required automatic renewal offer terms and/or continuous service offer terms in a clear and conspicuous manner (if at all) before the subscription or purchasing agreement is fulfilled?

- Do Defendants obtain a consumer's express affirmative consent to the automatic renewal or continuous service offer terms?

- Do Defendants include information in their contract(s) with consumers that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their affirmative consent to the automatic renewal or continuous service?

- Do Defendants obstruct or delay consumers from canceling the automatic renewal or continuous service?

e)      *RICO Class:*  Common questions of law and fact within the RICO Class include, but are not limited to, the following:

- Have Defendants agreed and worked together to form and operate a common plan, *i.e.*, "Savage X Fenty"?

43

CLASS ACTION COMPLAINT

- Have Defendants committed wrongful acts pursuant to their agreement?

- Are Defendants engaged in a scheme to defraud consumers who visited the Website of their money?

- Did Defendants use wire services in furtherance of their scheme?

- Did Defendants cause the mail to be used in furtherance of their scheme?

- Have Defendants engaged in a pattern of racketeering activity?

- Have Defendants conspired among themselves?

In addition, common questions within each class and/or across the various classes include ones concerning the amount of damages and other relief – including, but not limited to, injunctive relief – to be awarded to Plaintiffs and the class members.

103. *Typicality:* Plaintiffs' claims are typical of the claims of the members of the respective classes that they seek to represent. For example, Plaintiffs Ms. Maxwell and Ms. Theus, as well as the members of the Pre-February 20 Tariff Class, each were charged a tariff-related fee(s) and/or surcharge(s) by Defendants between and including (at least) April 2, 2025 and February 20, 2026. Similarly, Plaintiff Ms. Gonzalez, as well as the other members of the Post-February 20 Tariff Class, each were charged a tariff-related fee(s) and/or surcharge(s) after February 20, 2026. Furthermore, Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Theus, as well as the other members of the Gift Card Class, each had Credits for which they paid that were made to expire, and that they were forced to forfeit, 12 months after they were purchased (if not sooner). Further, Ms. Maxwell, Ms. Potts, and Ms. Gonzalez, as well as the other members of the Membership Class, all became and were at some time "Savage

X Fenty" members.  Further still, Ms. Maxwell, Ms. Potts, and Ms. Gonzalez, as well as the other members of the RICO Class, each were (or are) a "Savage X Fenty" member and/or a user of and/or purchaser from the Website.

104.  *Adequacy of Representation:*  Plaintiffs are adequate class representatives because (i) their interests do not conflict with the interests of the respective class members whom each seeks to represent; (ii) they have retained competent counsel who are experienced in complex class-action litigation; and (iii) they intend to prosecute this action vigorously.  All class members' interests will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

105.  *Predominance:*  In each of the five classes, *i.e.*, the Pre-February 20 Tariff Class, the Post-February 20 Tariff Class, the Gift Card Class, the Membership Class, and the RICO Class, common questions of law and fact predominate over any questions affecting only individual class members.  With respect to each class, similar or identical violations, business practices, and injuries are involved.  Indeed, many similar or identical violations, business practices, and/or injuries stretch across more than one class.  Individual questions (in any of the classes), if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.  For example, Defendants' liability is common to the class representatives and each member of the respective classes.

106.  *Superiority:*  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the class members are relatively small, making it impracticable for any class member to bear the burden and expense required to individually prosecute claims against Defendants.  Even if class members could afford individual litigation, the court system could not.  Individual litigation creates a potential for inconsistent or contradictory judgments and increases the

CLASS ACTION COMPLAINT

delay and expense to all parties and the court system. By contrast, the class-action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

107. *Ascertainability:* Members of each of the classes are ascertainable. Class membership is defined using objective criteria, and the members of the respective classes may be readily identified through Defendants' books and records.

**COUNT I**
**VIOLATION OF CALIFORNIA CIVIL CODE § 1750, *et seq.***
**(Consumers Legal Remedies Act (the "CLRA"))**
**Against all Defendants**
**(On Behalf of Plaintiffs Ms. Maxwell and Ms. Theus**
**<u>and the Pre-February 20 Tariff Class)</u>**

108. Paragraphs 1-107 above are incorporated by reference as though fully set forth herein.

109. The CLRA makes certain "unfair methods of competition and unfair or deceptive acts or practices … undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful." Cal. Civ. Code § 1770(a) ("Section 1770(a)").

110. Plaintiffs Ms. Maxwell, and Ms. Theus, as well as each member of the Pre-February 20 Tariff Class, are "consumers" as defined by California Civil Code § 1761(d) ("Section 1761(d)"). They are individuals who seek to acquire, or have acquired, by purchase, goods for personal, family, or household purposes.

111. Defendants' sale of products are "transactions" within the meaning of California Civil Code § 1761(e) ("Section 1761(e)"), *i.e.*, they are agreements between Defendants and consumers.

112. The products purchased by Plaintiffs Ms. Maxwell and Ms. Theus, as well as by the members of the Pre-February 20 Tariff Class, are "goods" or

CLASS ACTION COMPLAINT

"services" within the meaning of California Civil Code § 1761(a)-(b) ("Sections 1761(a)-(b)").   In particular, the products include "tangible chattels" that the consumers bought "for use primarily for personal, family, or household purposes, including certificates or coupons exchangeable for these goods."  Cal. Civ. Code § 1761(a).

113.  Defendants are "persons."  *See* Cal. Civ. Code § 1761(c) ("'Person' means an individual, partnership, corporation, limited liability company, association, or other group, however organized.").

114.  For the reasons described above, Defendants willfully and/or intentionally violated, at a minimum, the following practices proscribed by Section 1770(a) in transactions with Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the Pre-February 20 Tariff Class members, which were intended to result in, and did result in, the sale of products to them by Defendants:

- advertising goods or services with intent not to sell them as advertised;

- inserting an unconscionable provision in the contract; and

- advertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges ….

115.  Defendants' material misrepresentations, *etc.* were made to all consumers, including Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the members of the Pre-February 20 Tariff Class.  As such, they are entitled to a presumption of reliance.

116.  Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the Pre-February 20 Tariff Class members, are consumers who have suffered economic injury and/or damages, including benefit-of-the-bargain damages and/or out-of-pocket loss damages, as a direct result of, *inter alia*, Defendants' use and employment of the false and misleading pricing scheme alleged herein.

47

CLASS ACTION COMPLAINT

117.    Plaintiffs Ms. Maxwell and Ms. Theus, through counsel, will send a CLRA demand letter by certified mail to Defendants that provides notice of Defendants' violations of the CLRA, as alleged herein, and demand that Defendants notify all members of the Pre-February 20 Tariff Class and correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein.  If Defendants do not respond to Plaintiffs Ms. Maxwell, and Ms. Theus' letter and agree to rectify the problems associated with the actions detailed herein and give notice to all affected consumers within 30 days of the date of written notice pursuant to California Civil Code § 1782 ("Section 1782"), Plaintiffs will amend this complaint to seek actual, punitive, and statutory damages, for this claim as appropriate against Defendants.

### COUNT II
### VIOLATION OF CALIFORNIA CIVIL CODE § 1750, *et seq.*
### (The CLRA)
### Against all Defendants
### (On Behalf of Plaintiff Ms. Gonzalez and the Post-February 20 Tariff Class)

118.    Paragraphs 1-107 above are incorporated by reference as though fully set forth herein.

119.    The CLRA makes certain "unfair methods of competition and unfair or deceptive acts or practices … undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful." Cal. Civ. Code § 1770(a).

120.    Plaintiff Ms. Gonzalez, as well as each member of the Post-February 20 Tariff Class, are "consumers" as defined by Section 1761(d).  They are individuals who seek to acquire, or have acquired, by purchase, goods for personal, family, or household purposes.

121.    Defendants' sale of products are "transactions" within the meaning Section 1761(e), *i.e.*, they are agreements between Defendants and consumers.

CLASS ACTION COMPLAINT

122.  The products purchased by Plaintiff Ms. Gonzalez, as well as by the members of the Post-February 20 Tariff Class, are "goods" or "services" within the meaning of Sections 1761(a)-(b).  In particular, the products include "tangible chattels" that the consumers bought "for use primarily for personal, family, or household purposes, including certificates or coupons exchangeable for these goods."  Cal. Civ. Code § 1761(a).

123.  Defendants are "persons."  *See* Cal. Civ. Code § 1761(c) ("'Person' means an individual, partnership, corporation, limited liability company, association, or other group, however organized.").

124.  For the reasons described above, Defendants willfully and/or intentionally violated, at a minimum, the following practices proscribed by Section 1770(a) in transactions with Plaintiff Ms. Gonzalez, as well as the Post-February 20 Tariff Class members, which were intended to result in, and did result in, the sale of products to them by Defendants:

- advertising goods or services with intent not to sell them as advertised;

- inserting an unconscionable provision in the contract; and

- advertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges ….

125.  Defendants' material misrepresentations, *etc*. were made to all consumers, including Plaintiff Ms. Gonzalez and the members of the Post-February 20 Tariff Class.  As such, they are entitled to a presumption of reliance.

126.  As an illustration, "Savage X Satin Boxers" have been advertised on the Website as costing $29.95 (for non-members) or $8.98 (for new members at least):

49

CLASS ACTION COMPLAINT





SAVAGE X SATIN BOXERS

NEW MEMBER OFFER - 70% OFF

**$8.98** ~~$29.95~~

**RIHANNA'S PICK**

127.   However, when a consumer attempts to purchase the product at the advertised price, a tariff-related charge is added:[53]

[*Remainder of page left intentionally blank.*]

---

[53]   Upon information and belief, the example provided in paragraphs 126-127 herein also illustrates how tariff-related fees and/or surcharges were imposed between and including (at least) April 2, 2025 and February 20, 2025, *i.e.*, they were ***not*** part of the advertised price.

CLASS ACTION COMPLAINT



128. Plaintiff Ms. Gonzalez and the Post-February 20 Tariff Class members are consumers who have suffered economic injury and/or damages, including benefit-of-the-bargain damages and/or out-of-pocket loss damages, as a direct result of, *inter alia*, Defendants' use and employment of the false and misleading pricing scheme alleged herein.

129. Relevant violations, injuries, harms, and damages are continuing, on-going, and/or increasing.

130. Plaintiff Ms. Gonzalez, through counsel, will send a CLRA demand letter by certified mail to Defendants that provides notice of Defendants' violations of the CLRA, as alleged herein, and demand that Defendants notify all members of the Post-February 20 Tariff Class and correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein. If Defendants do not respond to Plaintiff Ms. Gonzalez's letter and agree to rectify the problems associated with the actions detailed herein and give notice to all affected consumers within 30 days of the date of written notice pursuant to Section 1782,

51

CLASS ACTION COMPLAINT

Plaintiffs will amend this complaint to seek actual, punitive, and statutory damages, for this claim as appropriate against Defendants.

## COUNT III
## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, *et seq.*
## (Unfair Competition Law (the "UCL"))
## Against all Defendants
## (On Behalf of Plaintiffs Ms. Maxwell and Ms. Theus and the Pre-February 20 Tariff Class)

131.    Paragraphs 1-117 above are incorporated by reference as though fully set forth herein.

132.    Pursuant to the UCL, "[u]nfair competition," which includes, *inter alia*, "any unlawful, unfair or fraudulent business act or practice" is illegal.  Cal. Bus. & Prof. Code § 17200.

133.    The UCL imposes strict liability.  Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the members of the Pre-February 20 Tariff Class, need not prove that Defendants, who are engaged in "business practices," intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

134.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

135.    Defendants' actions constitute "unfair" business practices because, as alleged above, the Defendants, *inter alia*, engaged in drip pricing, charged junk fees, mischaracterized those fees as "taxes," and refused to refund the fees and/or surcharges paid by consumers as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders.  Defendants' acts and practices, which

CLASS ACTION COMPLAINT

threatened and harmed competition, offended (and are tethered to), at a minimum, an established public policy of transparency in pricing, including as evidenced by California's "Honest Pricing Law" as well as regulations enacted by the FTC, and constituted immoral, unethical, oppressive, and unscrupulous activities that were substantially injurious to consumers.

136. The harm emanating from this practice(s) to Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the members of the Pre-February 20 Tariff Class, outweighs any utility it provides because Defendants' practice of engaging in drip pricing, charging junk fees, mischaracterizing tariff-related fees and/or surcharges as "taxes," and refusing to refund the fees and/or surcharges paid by consumers as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders provides no utility. There were reasonably available alternatives to further Defendants' legitimate business interests (if any) other than the misleading and deceptive conduct described herein.

137. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

138. Defendants' acts and practices alleged above constitute fraudulent business acts or practices as Defendants have deceived and/or were highly likely to deceive Plaintiffs Ms. Maxwell and Ms. Theus; the members of the Pre-February 20 Tariff Class; and members of the consuming public. Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the members of the Pre-February 20 Tariff Class, relied on Defendants' fraudulent and deceptive representations regarding the prices, fees, and/or surcharges charged for goods. Those misrepresentations played a substantial role in the decision by Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as

CLASS ACTION COMPLAINT

well as the members of the Pre-February 20 Tariff Class, to purchase products; they would not have purchased those products without Defendants' misrepresentations.[54]

139.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

140.    Defendants' acts and practices alleged above constitute unlawful business acts or practices, as Defendants have violated state and/or federal law, including, but not necessarily limited to, the CLRA and California's Automatic Purchases Renewal Law ("CAPRL"), in connection with, at a minimum, their deceptive pricing scheme.

141.    Defendants' practices, as set forth above, misled Plaintiff Ms. Maxwell and Plaintiff Ms. Theus; the Pre-February 20 Tariff Class members; and the public in the past.  Consequently, Defendants' practices (including, but not limited to, their refusal to refund any amounts paid as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders) constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

142.    Those deceptive actions, acts, omissions, and practices caused actual, ascertainable loss, harm, damage, and/or (economic and/or other) injury to Plaintiff

---

[54] Plaintiffs Ms. Maxwell and Ms. Theus, as well as the members of the Pre-February 20 Tariff Class, allege, "in essence, a type of 'bait and switch' advertising.  In such a scheme, one of the dangers is that the consumer will rely on the deceptive advertising to decide to buy merchandise.  Then, when the deception is revealed, the consumer, now invested in the decision to buy and swept up in the momentum of events, nonetheless buys at the inflated price, despite his or her better judgment." *Veera v. Banana Repub. LLC*, 6 Cal. App. 5th 907, 921 (Cal. Ct. App. 2017) (citations omitted). *Cf. also*, *e.g.*, Federal Trade Comm'n, Trade Regulation Rule on Unfair or Deceptive Fees, 16 CFR Part 464, 88 FR 77420-01, 77432, 2023 WL 7386022 (Nov. 9, 2023) ("Pricing structures that do not initially disclose the total cost of a good or service are deceptive even if the total cost is disclosed at some point during the transaction.  It has long been the FTC's position that misleading door openers are deceptive.").

CLASS ACTION COMPLAINT

Ms. Maxwell and Plaintiff Ms. Theus, as well as to the Pre-February 20 Tariff Class members – that is, at a minimum, the amount(s) of the tariff-related fees and/or surcharges charged by and paid to Defendants that were not refunded to consumers.

143.    Plaintiff Ms. Maxwell, and Plaintiff Ms. Theus, as well as the Pre-February 20 Tariff Class members, have (i) expended money due to Defendants' acts and omissions; (ii) lost money or property; and/or (iii) been denied money to which they have a cognizable claim.

## COUNT IV
## VIOLATION OF CAL. BUS. & PROF. CODE § 17200, *et seq.*
## (The UCL)
## Against all Defendants
## (On Behalf of Plaintiff Ms. Gonzalez and the Post-February 20 Tariff Class)

144.    Paragraphs 1-107 and 118-130 above are incorporated by reference as though fully set forth herein.

145.    Pursuant to the UCL "[u]nfair competition," which includes, *inter alia*, "any unlawful, unfair or fraudulent business act or practice" is illegal.  Cal. Bus. & Prof. Code § 17200.

146.    The UCL imposes strict liability.  Neither Plaintiff Ms. Gonzalez nor the members of Post-February 20 Tariff Class need to prove that Defendants, who are engaged in "business practices," intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices; they only to show that such practices occurred.

147.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

CLASS ACTION COMPLAINT

148.   Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants, *inter alia*, engaged in drip pricing, charged junk fees, and/or mischaracterized those fees as "taxes." Defendants' acts and practices, which threaten and harm competition, offend (and are tethered to), at a minimum, an established public policy of transparency in pricing, including as evidenced by California's "Honest Pricing Law" as well as regulations enacted by the FTC, and constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

149.   The harm emanating from this practice(s) to Plaintiff Ms. Gonzalez and the members of the Post-February 20 Tariff Class outweighs any utility it provides because Defendants' practice of engaging in drip pricing, charging junk fees, and/or mischaracterizing those fees as "taxes" provides no utility. There were reasonably available alternatives to further Defendants' legitimate business interests (if any) other than the misleading and deceptive conduct described herein.

150.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

151.   Defendants' acts and practices alleged above constitute fraudulent business acts or practices as Defendants have deceived Plaintiff Ms. Gonzalez and the members of the Post-February 20 Tariff Class and are highly likely to deceive members of the consuming public. Plaintiff Ms. Gonzalez and the members of the Post-February 20 Tariff Class relied on Defendants' fraudulent and deceptive representations – which were made to consumers and the class generally – regarding the prices, fees, and/or surcharges charged for goods. These misrepresentations played a substantial role in Plaintiff Ms. Gonzalez's and the members of the Post-

February 20 Tariff Class's decisions to purchase products; they would not have purchased those products without the Defendants' misrepresentations.[55]

152.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

153.   Defendants' acts and practices alleged above constitute unlawful business acts or practices, as Defendants have violated state and/or federal law, including, but not necessarily limited to, the CLRA and CAPRL, in connection with, at a minimum, their deceptive pricing scheme.

154.   Defendants' practices, as set forth above, misled Plaintiff Ms. Gonzalez, the Post-February 20 Tariff Class, and the public in the past and will continue to mislead them in the future.   Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

155.   Defendants' violations of the UCL, through their unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat to Plaintiff Ms. Gonzalez, the members of the Post-February 20 Tariff Class, and the public who, if Defendants' drip pricing, junk fees, and/or mischaracterization of those fees as "taxes" are permitted to continue, will continue to be deceived into purchasing products based on, *inter alia*, artificially low prices that do not include surprise, hidden, and/or misleading fees, which are added later.

156.   Those deceptive actions, acts, omissions, and practices also have caused actual, ascertainable loss, harm, damage, and/or (economic and/or other) injury to Plaintiff Ms. Gonzalez and the Post-February 20 Class members – that is, at a minimum, the amount(s) of the tariff-related fee and/or surcharge charged by and paid to Defendants.

---

[55] *See supra* at 54 n. 54.

CLASS ACTION COMPLAINT

157. Plaintiff Ms. Gonzalez and the Post-February 20 Class members have (i) expended money due to Defendants' acts and omissions; (ii) lost money or property; and/or (iii) been denied money to which they have a cognizable claim.

158. Relevant violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

159. Because of the surreptitious nature of Defendants' deception, these losses, injuries, harms, and damages cannot be reasonably avoided and will continue to be suffered by the consuming public absent a mandated change in Defendants' practice.

**COUNT V**
**UNJUST ENRICHMENT**
**(Charge of Tariff-Related Fees and/or Surcharges)**
**Against All Defendants**
**(By Plaintiffs Ms. Maxwell, Ms. Theus, and Ms. Gonzalez and**
**the Pre-February 20 Tariff Class and**
**the Post-February 20 Tariff Class)**

160. Paragraphs 1-159 above are incorporated by reference as though fully set forth herein.

161. Defendants were unjustly enriched at the expense of Plaintiff Ms. Maxwell, Plaintiff Ms. Theus, and Plaintiff Ms. Gonzalez, as well as the members of the Pre-February 20 Tariff Class and the Post-February 20 Tariff Class.

162. Plaintiff Ms. Maxwell, Plaintiff Ms. Theus, and Plaintiff Ms. Gonzalez, as well as the members of the Pre-February 20 Tariff Class and the Post-February 20 Tariff Class, conferred a benefit(s) on Defendants by paying the tariff-related fees and/or surcharges.

163. Defendants knowingly accepted and received the benefit(s) conferred upon them by Plaintiff Ms. Maxwell, Plaintiff Ms. Theus, and Plaintiff Ms. Gonzalez, as well as by the members of the Pre-February 20 Tariff Class and the Post-February 20 Tariff Class.

CLASS ACTION COMPLAINT

164. Defendants have retained the full benefit of the tariff-related fees and/or surcharges paid by Plaintiff Ms. Maxwell, Plaintiff Ms. Theus, and Plaintiff Ms. Gonzalez, as well as by the members of the Pre-February 20 Tariff Class and the Post-February 20 Tariff Class.

165. It would be unjust and inequitable for Defendants to retain that benefit(s) under the factual circumstances set forth above.

166. Defendants have, however, so far retained the full benefit of the tariff-related fees and/or surcharges paid by Plaintiff Ms. Maxwell, Plaintiff Ms. Theus, and Plaintiff Ms. Gonzalez, as well as by the members of the Pre-February 20 Tariff Class and the Post-February 20 Tariff Class.

167. Relevant violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

**COUNT VI**
**CONVERSION**
**(Tariff-Related Fees and Surcharges)**
**Against All Defendants**
**(By Plaintiffs Ms. Maxwell, Ms. Theus, and Ms. Gonzalez and**
**the Pre-February 20 Tariff Class and**
**the Post-February 20 Tariff Class)**

168. Paragraphs 1-167 above are incorporated by reference as though fully set forth herein.

169. Conversion is a strict-liability tort.

170. Plaintiff Ms. Maxwell, Plaintiff Ms. Theus, and Plaintiff Ms. Gonzalez, as well as the members of the Pre-February 20 Tariff Class and the Post-February 20 Tariff Class, have a legal right to the amount(s) of money charged and collected by Defendants under the guise of tariff-related fees and/or surcharges. In other words, it was the customers' money that Defendants collected and still hold.

CLASS ACTION COMPLAINT

171.   The imposition of the tariff-related fee(s) and/or surcharge(s) (at least in the manner in which they were assessed) was wrongful and/or improper. Defendants were not authorized to charge, collect, or assume control over the money (at least not in the way that they did).

172.   Upon receipt of that money, Defendants assumed control over it to the exclusion of the rights of Plaintiff Ms. Maxwell, Plaintiff Ms. Theus, and Plaintiff Ms. Gonzalez, as well as the members of the Pre-February 20 Tariff Class and the Post-February 20 Tariff Class.

173.   As a result, Plaintiff Ms. Maxwell, Plaintiff Ms. Theus, and Plaintiff Ms. Gonzalez, as well as the members of the Pre-February 20 Tariff Class and the Post-February 20 Tariff Class, have been damaged, injured, and/or harmed.

174.   Relevant violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

**COUNT VII**
**UNJUST ENRICHMENT**
**(Retention of Tariff-Related Fees and/or Surcharges)**
**Against All Defendants**
**(On Behalf of Plaintiffs Ms. Maxwell, and Ms. Theus**
<u>**and the Pre-February 20 Tariff Class)**</u>

175.   Paragraphs 1-117, 131-143, and 160-174 above are incorporated by reference as though fully set forth herein.

176.   Defendants were unjustly enriched at the expense of Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the members of the Pre-February 20 Tariff Class.

177.   Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the members of the Pre-February 20 Tariff Class, conferred a benefit(s) on Defendants by paying the fee(s) and/or surcharge(s) charged by the Defendants as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders.  But for the tariffs first imposed on Defendants in 2025, Plaintiff Ms. Maxwell and Plaintiff Ms.

CLASS ACTION COMPLAINT

Theus, as well as the members of the Pre-February 20 Tariff Class, would not have been charged or required to pay the fees and/or surcharges associated with those tariffs.

178.   Defendants knowingly accepted and received the benefit(s) conferred upon them by Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as by the members of the Pre-February 20 Tariff Class

179.   Defendants have retained the full benefit(s) of the tariff-related fees and/or surcharges paid by Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as by the members of the Pre-February 20 Tariff Class, as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders.

180.   Those tariffs have been determined to be unlawful, and Defendants had no basis to collect and/or retain the associated amounts from Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as from the members of the Pre-February 20 Tariff Class.  If Defendants – who can seek and obtain a refund for payment(s) of the tariffs imposed by the 2025 Executive Orders – are permitted to retain the tariff-related fees and/or surcharges paid by consumers, they will obtain a windfall at the expense of Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the members of the Pre-February 20 Tariff Class.

181.   It would be unjust and inequitable for Defendants to retain that benefit(s) under the factual circumstances set forth above – most notably, the Supreme Court's ruling in *Learning Resources*.

182.  Relevant violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

CLASS ACTION COMPLAINT

## COUNT VIII
## MONEY HAD AND RECEIVED
### Against All Defendants
### (On Behalf of Plaintiffs Ms. Maxwell and Ms. Theus
### and the Pre-February 20 Tariff Class)

183.    Paragraphs 1-117, 131-143, and 160-182 above are incorporated by reference as though fully set forth herein.

184.    As a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders, Defendants compelled Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the members of the Pre-February 20 Tariff Class, to pay tariff-related fees and/or surcharges.

185.    That money was paid to Defendants by Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as by the members of the Pre-February 20 Tariff Class. To be clear, Defendants improperly received that money, which was for the use of Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the members of the Pre-February 20 Tariff Class.  Had those consumers not paid that money they would not have received their "Savage X Fenty" products.

186.    That money belongs to Plaintiff, Ms. Maxwell and Plaintiff Ms. Theus, as well as the members of the Pre-February 20 Tariff Class, and should be returned to them.

187.    Specifically, the money that was paid as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders, which have now been struck down by the Supreme Court, and/or any refund received by Defendants for the illegal tariffs it paid, in good conscience and/or equity belong to and ought to be paid, returned, and/or refunded to Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as to the members of the Pre-February 20 Tariff Class.

188.    Defendants have not, however, returned that money to Plaintiff Ms. Maxwell or Plaintiff Ms. Theus, or to the members of the Pre-February 20 Tariff Class.

189. Relevant violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

**COUNT IX**
**DECLARATORY JUDGMENT**
**Against All Defendants**
**(On Behalf of Plaintiffs Ms. Maxwell and Ms. Theus**
**and the Pre-February 20 Tariff Class)**

190. Paragraphs 1-117, 131-143, and 160-189 above are incorporated by reference as though fully set forth herein

191. Pursuant to 28 U.S.C. § 2201(a), "[i]n a cause of actual controversy within its jurisdiction," this Court, "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree and shall be renewable as such." *Id.*

192. There is an actual, substantial controversy that is real and immediate between the parties (here, Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the members of the Pre-February 20 Tariff Class, on the one hand, and Defendants, on the other) who have adverse legal interests. Issuance of a declaratory judgment would serve a useful purpose in clarifying these parties' legal relations.

193. Plaintiff Ms. Maxwell and Plaintiff Ms. Theus, as well as the members of the Pre-February 20 Tariff Class, are entitled to a declaration that a business seeking and/or receiving a refund from the federal government for amounts paid as a result, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders is ***not*** a condition, precondition, or prerequisite for a consumer(s) being able to seek and/or receive a refund(s) of any amounts the consumer paid to a business as a result, due to, and/or to offset any or all of those tariffs.

CLASS ACTION COMPLAINT

## COUNT X
## VIOLATION OF SECTION 1749.5
### (The Gift Card Law)
### Against all Defendants
### (On Behalf of Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Theus and the Gift Card Class)

194.    Paragraphs 1-107 above are incorporated by reference as though fully set forth herein.

195.    Section 1749.5 makes it "unlawful for any person or entity to sell a gift certificate to [a] purchaser that contains … [a]n expiration date."  Cal. Civ. Code. § 1749.5.

196.    "Gift certificates" include "electronic gift cards."  Cal. Civ. Code § 1749.45.

197.    The Credits issued by Defendants, which are provided to consumers in exchange for money, constitute a "gift certificate" under California law.  They constitute an electronic promise(s) that is redeemable at "Savage X Fenty" that was issued in a specific amount(s) in exchange for a payment(s) and are to be honored when presented to "Savage X Fenty" by a customer(s).  Specifically, upon information and belief, each Credit issued now has a value equal to $69.95.  At other times, additional values may have been assigned to the Credits.  *See supra* at 12 n.18.  Regardless, the value of each Credit is known to, at a minimum, Defendants and is readily discernible.

198.    Defendants willfully and/or intentionally violated California's Gift Card Law by making Credits expire 12 months after the date of purchase (if not sooner) and/or by making them expire when an individual cancels his or her membership or within 12 months thereafter.  When the Credits expire, "Savage X Fenty" members receive no value for them despite having already paid for them.

CLASS ACTION COMPLAINT

199.   As a result, Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the Gift Card Class members, have suffered economic loss(es), injury(ies), and/or damage(s).

200.   Relevant violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

## COUNT XI
## UNJUST ENRICHEMENT
### (Credits)
### Against all Defendants
### (On Behalf of Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Theus and the Gift Card Class)

201.   Paragraphs 1-107 and 194-200 above are incorporated by reference as though fully set forth herein.

202.   Defendants were unjustly enriched at the expense of Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class.

203.   Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, conferred a benefit(s) on Defendants by paying a $69.95 (or other) monthly charge, *see supra* at 12 n.18,  in exchange for a promise to be able to use Credits equal to that value for a later purchase at "Savage X Fenty."

204.   Defendants knowingly accepted and received the benefit(s) conferred upon them by Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as by the members of the Gift Card Class.

205.   Defendants have retained the full value of that benefit(s), *i.e.*, the monthly payments made by Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as by the members of the Gift Card Class.

206. It would be unjust and inequitable for Defendants to retain that benefit(s) under the factual circumstances set forth above, including, but not limited to, the public policy of the State of California against gift certificates or gift cards expiring.

207. Relevant violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

**COUNT XII**
**CONVERSION**
**(Credits)**
**Against all Defendants**
**(On Behalf of Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Theus and the Gift Card Class)**

208. Paragraphs 1-107 and 194-207 above are incorporated by reference as though fully set forth herein.

209. Conversion is a strict-liability tort.

210. Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, have a legal right to money in an amount equal to the value of unused Credits for which they prepaid. Those Credits (and the value associated with them), in other words, were the property of Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class.

211. However, through their wrongful and/or impermissible acts, as set forth above, Defendants wrongfully and/or impermissibly deprived Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, of those Credits and their value, which were segregated in individual members' "Savage X Fenty" accounts, by making them expire after 12 months (if not sooner) in contravention of California law. The amounts at issue were

identifiable because they appeared in individuals' separate "Savage X Fenty" accounts.

212.  Upon "expiration" of the Credits, Defendants assumed control of the unused Credits and their associated value to the exclusion of Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class.

213.  As a result, Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, have been damaged, injured, and/or harmed.

214.  Relevant violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

## COUNT XIII
## BREACH OF CONTRACT
### Against All Defendants
### (On Behalf of Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Theus and the Gift Card Class)

215.  Paragraphs 1-107 and 194-214 above are incorporated by reference as though fully set forth herein.

216.  Alternatively and/or additionally, Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, contracted with Defendants to join the "Savage X Rewards Membership" and to receive Credits in exchange for monthly payments – Credits that could be used to purchase goods some time in the future.

217.  To be sure, there was no negotiation over the contract(s) and/or its terms.  Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the Gift Card Class members, had to "take it or leave it."

CLASS ACTION COMPLAINT

218. One term of the contract(s) was that in exchange for a payment of $69.95 (or a similar amount) each month, the member would receive and have a Credit(s) equal to that amount available to use in the future.

219. To the extent that one of the contractual terms purportedly was that unused Credits would expire after 12 months, that term is void and/or otherwise unenforceable. For one, such a term, which also is contrary to another term(s) included in the agreement, violates the public policy of the State of California, as set forth in, codified in, established by, and/or illustrated by California's Gift Card Law. The interest in the enforcement of this term is outweighed in these circumstances at least by California's public policy against the enforcement of such term. It is also a term of adhesion. In addition, this "term" is unconscionable, unfair, and the direct result of the parties' markedly disparate bargaining positions.

220. Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, paid the requisite amounts and fully and adequately performed all obligations and duties required by the contract(s).

221. By making Credits expire and by requiring that Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as members of the Gift Card Class, forfeit unused Credits and their associated value, Defendants breached the contract(s). They failed to deliver to Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as to the members of the Gift Card Class, the full value for which they had paid monthly. In other words, Defendants failed to fulfill their obligations under the contract(s).

222. Defendants' breaches of the contract(s) caused Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, to suffer loss(es) and/or damages.

223. Relevant breaches, violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

CLASS ACTION COMPLAINT

## COUNT XIV
## BREACH OF IMPLIED CONTRACT
### Against All Defendants
### (On Behalf of Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Theus and the Gift Card Class)

224. Paragraphs 1-107 and 194-223 above are incorporated by reference as though fully set forth herein.

225. To the extent that this Court determines that there is no express contract(s) between Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, and Defendants, there would have been an implied contract(s). Accordingly, alternatively and/or additionally, Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, have entered into an implied contract(s) with Defendants to join the "Savage X Rewards Membership" and to receive Credits in exchange for monthly payments – Credits that can be used to purchase goods some time in the future.

226. There were no negotiations over the implied contract(s) and/or its terms. Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, had to "take it or leave it."

227. One term of the implied contract(s) was that in exchange for a payment of $69.95 (or a similar amount) each month, the member would have a Credit(s) equal to that amount available to use in the future.

228. To the extent that one of the terms of the implied contract(s) purportedly was that Credits would expire after 12 months, that term is void and/or otherwise unenforceable. For one, such a term, which also is contrary to another term(s) included in the agreement, violates the public policy of the State of California, as set forth in, codified in, established by, and/or illustrated by California's Gift Card Law. The interest in the enforcement of this term is

outweighed in these circumstances at least by California's public policy against the enforcement of such term.  It is also a term of adhesion.  In addition, this "term" is unconscionable, unfair, and the direct result of the parties' markedly disparate bargaining positions.

229.   Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, paid the requisite amounts and fully and adequately performed all obligations and duties required by the implied contract(s).

230.   By making Credits expire and by requiring that Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, forfeit those Credits and their associated value, Defendants breached the implied contract(s).  They failed to deliver to Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, the full value for which they had paid monthly.  In other words, Defendants failed to fulfill their obligations under the implied contract(s).

231.   Defendants' breaches of the implied contract(s) caused Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as members of the Gift Card Class, to suffer loss(es) and/or damages.

232.   Relevant breaches, violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

## COUNT XV
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### Against All Defendants
### (On Behalf of Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Theus and the Gift Card Class)

233.   Paragraphs 1-107 and 194-232 above are incorporated by reference as though fully set forth herein.

70

234.  Every contract entered into in California "contains an implied covenant of good faith and fair dealing," which means, *inter alia*, that neither party to that contract shall do "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[56]

235.  Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, paid the requisite amounts and fully and adequately performed all obligations and duties required by the contract(s).

236.  By making unused Credits expire and by requiring that Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, forfeit those Credits and their associated value, Defendants breached the implied covenant of good faith and fair dealing.  In other words, they failed to fulfill their obligations under the contract(s), and they prevented Plaintiff Ms. Maxwell, Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, from receiving all of the fruits of their contract(s).

237.  Defendants' breaches of the implied covenant of good faith and fair dealing caused Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Theus, as well as the members of the Gift Card Class, to suffer loss(es) and/or damages.

238.  Relevant breaches, violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

---

[56]  *Wolf v. Superior Ct.*, 107 Cal. App. 4th 25, 31 (2d Dist. 2011) (internal quotations omitted).

CLASS ACTION COMPLAINT

## COUNT XVI
## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONAL CODE § 17602
## (CAPRL)
### Against All Defendants
### (On Behalf of Plaintiffs Ms. Maxwell, Ms. Potts, Ms. Gonzalez and the Membership Class)

239.   Paragraphs 1-107 above are incorporated by reference as though fully set forth herein.

240.   California law makes it "unlawful for a business that makes an automatic renewal offer or continuous service offer to a consumer in this state to … [f]ail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity … to the request for consent to the offer."  Cal. Bus. & Prof. Code § 17602(a)(1).

241.   The "Savage X Membership" is, at a minimum, a "continuous service." It is a plan, arrangement, or provision of a contract that provides for a paid subscription or purchasing agreement that continues until the consumer cancels the service.

242.   Through, at a minimum, the Website, "Savage X Fenty" makes an automatic renewal offer or continuous service offer to consumers in California and across the United States.

243.   Defendants, however, willfully and/or intentionally fail to present the required automatic renewal offer terms and/or continuous service offer terms in a clear and conspicuous manner (if at all) before the subscription or purchasing agreement is fulfilled.

244.   At the end of the online purchasing process, "Savage X Fenty" states:

245.  At a minimum, it does **not** state "[t]hat the automatic renewal or continual service will continue until the consumer cancels."  Cal. Bus. & Prof. Code § 17602(a)(8)(A).

246.  In addition, Defendants willfully and/or intentionally have failed to provide the notice required under California law **before** confirming the customer's billing information.  First, they fail to give certain of the required notices, such as that the membership will continue indefinitely until the consumer cancels it, at all. *See*, *e.g.*, *supra* at ¶ 245.  Second, they only present the purported acknowledgment **after** confirming the consumer's billing information.  For example:[57]

---

[57]  This example – which relates to a transaction that was never consummated – is for illustrative purposes only.  Immaterial personal information has been redacted.

CLASS ACTION COMPLAINT

247. Furthermore, while "Savage X Fenty" does seek and obtain the consumer's "agree[ment] to the paid Savage X Rewards Membership," it does not properly "obtain the consumer's **express affirmative consent to the automatic renewal or continuous service offer terms**." Cal. Bus. & Prof. Code § 17602(a)(4) (emphasis added).

248. Defendants also improperly "include[] … information in the contract that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their affirmative consent to the automatic renewal or continuous service." For example, because a consumer is required to check a single box for purposes of purportedly agreeing to **both** the membership **and** the website's "Terms and Conditions," it is impossible to know that the consumer has in fact agreed to either or both of them – never mind to even know whether the consumer has agreed specifically to the automatic renewal or continuous service.

CLASS ACTION COMPLAINT

249.    Furthermore, consumers' agreement to the terms of the membership, as well as to the "Terms & Conditions of this website," are sought and purportedly obtained via a "sign-in-wrap" agreement, which interferes with, detracts from, and/or undermines the ability of consumers to provide the necessary affirmative consent.

250.    In the world of internet contracts, there are browsewrap, clickwrap, scrollwrap, and sign-in wrap agreements, each of which purport to bind users through different 'assent' mechanisms.    In a browsewrap, the 'user accepts a website's terms of use merely by browsing the site,' although those terms are not always immediately apparent on the screen.    Courts consistently decline to enforce browsewraps.    In a clickwrap, the website presents its terms of use in a 'pop-up screen' and the user accepts those terms by clicking or checking a box stating she agrees.    …    Finally, a sign-in wrap lives somewhere in the middle: the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms."[58]    The "Savage X Fenty" "website resembles something between clickwrap and browsewrap.    Because [its] website provides a link to the" membership terms "but does not require that the user actually read them before moving on to purchase a subscription, the website most closely resembles a 'sign-in wrap agreement.'"[59]

251.    "[P]ending further word from the California appellate courts, … sign-in wrap agreements are in a gray zone ….    And in the gray zone of sign-in wrap agreements, enforceability requires conspicuous textual notice that completing a transaction or registration signifies consent to the site's terms and conditions.

[58]    *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025) (citations omitted).

[59]    *Chabolla*, 129 F.4th at 1154.

CLASS ACTION COMPLAINT

Whether such notice is sufficiently conspicuous will turn on the transactional context, the notice's size relative to other text on the site, the notice's proximity to the relevant button or box the user must click to complete the transaction or register for the service, and whether the notice's hyperlinks are readily identifiable."[60]

252.   On the Website, the provision stating that the consumer "agree[s] to the paid Savage X Rewards Membership and the Terms & Conditions of this website" appear in a light font.  That provision is obscured by the large bold heading above it and the larger, purple "Place Order" box below it.

253.   Further still, in that text, no part of the phrase "Savage X Rewards Membership" is a hyperlink.  And, there is nothing evidencing that "Terms and Conditions" is a hyperlink.  As such, it is impossible to readily determine that that phrase links to the "Savage X Fenty" "Terms of Service," which are not readily apparent on the website otherwise.[61]

254.   Defendants also willfully and/or intentionally "[m]isrepresent, expressly or by implication, [a] material fact related to the transaction[,]" Cal. Bus. & Prof. Code § 17602(a)(7) – specifically, that Credits do (or do not) expire.

255.   Furthermore, California law also requires that "if a business provides a mechanism for cancellation by toll-free telephone number," which "Savage X

---

[60]  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 868 (9th Cir. 2022) (Baker, J. concurring).

[61]  For these same reasons, **as well as others**, "Savage X Fenty" members also are not bound by those "Terms of Service" or any of the provisions therein.  Also, guests purchasing via the Website, upon information and belief, do not ever have to click any button acknowledging any terms or conditions.  Instead, as it relates to guests, the Terms of Service simply provide:  "By using our Services, you agree to these Terms of Service" (emphasis omitted).  Such a "browsewrap" agreement is *per se* unenforceable.  *See, e.g.*, *Berman*, 30 F.4th at 868 (explaining that "pending further word from the California appellate courts, browsewrap agreements are unenforceable per se") (Baker, J. concurring).  And, regardless, the Terms of Service, on their face, also do **not** apply to in-store purchases.

CLASS ACTION COMPLAINT

Fenty" does, "the business … shall not obstruct or delay the consumer's ability to cancel the automatic renewal or continuous service." Cal. Bus. & Prof. Code § 17602(c)(2). *See also*, *e.g.*, Cal. Bus. & Prof. Code § 17602(e)(1). Defendants, however, willfully and/or intentionally violate this requirement by, *inter alia*, requiring consumers to call "Savage X Fenty" multiple times before finally being able to cancel, requiring consumers to speak with a manager or supervisor before finally being able to cancel, and/or by trying to talk consumers out of cancelling. "Savage X Fenty" fails to promptly process the cancellation, and continues to obstruct and delay the cancellation, even when a consumer states his or her intention to "cancel."

256. As a result of Defendants' conduct, Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Gonzalez, as well as the Membership Class members, have experienced loss(es), damage(s), and/or injury(ies).

257. Relevant breaches, violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

**COUNT XVII**
**CIVIL CONSPIRACY**
**Against All Defendants**
**(On Behalf of Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Gonzales and the RICO Class)**

258. Paragraphs 1-257 above are incorporated by reference as though fully set forth herein.

259. Defendants formed and, at all relevant times, operated a common plan and/or conspiracy and/or designed to commit a tortious act, including, but not limited to, conversion. At bottom, Defendants agreed and worked together (and continue to do so) to form and operate a common plan – known as "Savage X Fenty" – and agreed to commit numerous tortious acts.

CLASS ACTION COMPLAINT

260.   As set forth above, and as further explained below, *see*, *e.g.*, *supra* at ¶ 271, Defendants have in fact committed numerous wrongful acts pursuant to their agreement.

261.   As a result of Defendants' wrongful acts, Plaintiff Ms. Maxwell, Plaintiff Ms. Potts, and Plaintiff Ms. Gonzalez, as well as the members of the RICO Class, have been damaged, injured, and/or harmed in the various manners and amounts set forth above.

262.   Relevant breaches, violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

**COUNT XVIII**
**VIOLATION OF 18 U.S.C. § 1962 ("Section 1962")**
**(Racketeer Influenced and Corrupt Organizations Act ("RICO"))**
**Against All Defendants**
**(On Behalf of Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Gonzalez and the RICO Class)**

263.   Paragraphs 1-262 above are incorporated by reference as though fully set forth herein.

264.   Section 1962(c) states:  "It shall be unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …." 18 U.S.C. § 1962(c).

265.   Section 1962(d) states, in relevant part, that "[i]t shall be unlawful for any person to conspire to violate" Section 1962(c).  18 U.S.C. § 1962(d).

266.    "Any person injured in his business or property by reason of a violation of [S]ection 1962  … may sue therefore in any appropriate United States district court …."  18 U.S.C. § 1964(c).

267. Each of the SXF Parties is an "entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). As such, each of them is a "person" pursuant to the RICO statute.

268. Each of the SXF Parties is associated with "Savage X Fenty," which qualifies as an "enterprise" under the RICO statute. "Savage X Fenty" is, *inter alia*, a "group of individuals" (for example, Ms. Fenty and Ms. Albright) and/or entities "associated in fact although not a legal entity." 18 U.S.C. § 1961(3).

269. Each of Defendants, who are engaged in interstate commerce, have participated in the "Savage X Fenty" enterprise, which is also engaged in interstate commerce, through a pattern of racketeering activity.

270. According to the RICO statute, "racketeering activity" includes, *inter alia*, "any act which is indictable under any of the following provisions of title 18, United States code … section 1341 (relating to mail fraud) [and] section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1)(B). The SXF Parties have engaged in acts prohibited by both of these sections.

271. The SXF Parties knowingly, willingly, and/or intentionally are and were, at all relevant times, engaged in a scheme to defraud consumers who visited the Website of their money. They, *inter alia*, charge consumers junk fees, engage in drip pricing, misrepresent the nature of the tariff-related fees and/or surcharges, refuse to return those fees and/or surcharges even after the tariffs imposed by the 2025 Executive Orders were struck down, continue to charge consumers an unexpected tariff fee(s) and/or surcharge(s) even after the Supreme Court's ruling in *Learning Resources*, use dark patterns, pressure consumers into becoming members, charge members monthly fees for Credits unless they quickly opt out, make unused Credits expire after 12 months (if not sooner), and make it exceedingly difficult to cancel memberships (the "Recent Racketeering Activity").

CLASS ACTION COMPLAINT

272. The SXF Parties use wire services in furtherance of the scheme. For example, they operate a website(s) that consumers around the United States (and around the world) can access to, *inter alia*, make purchases and become "Savage X Fenty" members. They also use the telephone in furtherance of their scheme – for example, making consumers, such as Ms. Potts, call "Savage X Fenty" to cancel their memberships. And, upon information and belief, they send numerous e-mails to "Savage X Fenty" website-users and/or members.

273. The SXF Parties, who knowingly, willingly, or intentionally formed and/or participate(d) in a scheme or artifice to defraud persons of their money, also have caused and continue to cause the mail to be used in furtherance of that scheme. Specifically, "Savage X Fenty" ships – and, upon information and belief, has, at all relevant times, shipped – its products via a private interstate commercial carrier, such as DHL, and/or in another manner in interstate commerce.

274. "A 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years … after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

275. Defendants have engaged and continue to engage in on-going and repeated racketeering activity, as evidenced by, *inter alia*, the 2022 "Savage X Fenty" settlement, *see, e.g., supra* at ¶2 & 1 n.1,[62] and the 2025 TFG settlement, *see*,

---

[62] *See also, e.g.*, Marc Bain, "Rihanna's Savage X Fenty suite uses a shady trick to sign up more members," *Quartz* (July 20, 2022), https://qz.com/quartzy/1698235/rihannas-savage-x-fenty-uses-dark-patterns-to-sign-up-more-members (last visited June 17, 2026); Chauncey Alcorn, "Rihanna's Savage X Fenty lingerie line accused of deceptive marketing tactics," *CNN* (Feb. 13, 2020), https://www.cnn.com/2020/02/13/business/rihanna-savage-x-deceptive-marketing (last visited June 17, 2026); "SavageX [sic] Fenty WON'T ALLOW MR TO CANCEL.," *reddit*, https://www.reddit.com/r/LingerieAddiction/comments/1by3m34/savagex_fenty_wont_allow_me_to_can

80

CLASS ACTION COMPLAINT

*e.g.*, *id.* at 2 n.2 – as well as their various acts and omissions that constitute the Recent Racketeering Activity, which have been occurring for months, if not years. There were at least two acts and omissions that were the subject of those past settlements and the attendant government investigations as well as that constitute the Recent Racketeering Activity.  All relevant acts and omissions occurred after 1970.

276.   The Recent Racketeering Activity occurred within 10 years of each other and of the SXF Parties' prior racketeering activity.

277.   In addition, the SXF Parties have illegally conspired – and continue to illegally conspire – among themselves to violate Section 1962(c).

278.   The SXF Parties' violations of Section 1962, racketeering activity, and conspiracy to violate Section 1962(c) have injured and/or damaged Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Gonzalez, as well as the members of the RICO Class, in the various manners and amounts set forth above.

279.   Relevant breaches, violations, losses, injuries, harms, and damages are continuing, on-going, and/or increasing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    an Order (i) certifying this action as a class action, (ii) appointing Plaintiffs Ms. Maxwell and Ms. Theus as class representatives for the Pre-February 20 Tariff Class, (iii) appointing Plaintiff Ms. Gonzalez as class representative for the Post-February 20 Tariff Class, (iv) appointing Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Theus as class representatives for the Gift Card Class and for the Membership Class, (v) appointing Plaintiffs Ms. Maxwell, Ms. Potts, and Ms. Gonzalez as class representatives for the RICO Class, and (vi) appointing Plaintiffs' counsel to represent the Pre-

cel/ (last visited June 17, 2026); "Do not buy from Savage X Fenty," *reddit*, https://www.reddit.com/r/ABraThatFits/comments/qqp9mn/do_not_buy_from_ savage_x_fenty/ (last visited June 17, 2026).

February 20 Tariff Class, the Post-February 20 Tariff Class, the Gift Card Class, the Membership Class, and the RICO Class;

B.     an award, or the return or refund, of – or restitution in an amount equal to – all monies acquired by Defendants by means of any and all illegal, improper, wrongful, unjust, and/or inequitable practice(s), act(s), omission(s) and/or conduct, including, but not limited to, making Credits expire;

C.     disgorgement of all amounts improperly, wrongfully, and/or unjustly charged, collected, received, maintained, retained, or held by Defendants;

D.     an award of actual, compensatory, and/or consequential damages in an amount(s) to be determined at trial;

E.     an award of nominal damages (in the alternative);

F.     an award of treble damages (if and as permitted by law, including, but not necessarily limited to, 18 U.S.C. § 1964(c));

G.     an award of punitive damages (if and as permitted by law, including, but not necessarily limited to, Cal. Civ. Code § 1780(a)(4));

H.     an award of attorneys' fees and expenses, and any other expense(s), including, including, but not necessarily limited to, expert witness fees (if and as permitted by law, including, but not necessarily limited to, Cal. Civ. Code § 1780(e) and/or 18 U.S.C. § 1964(c));

I.     an award of the costs of this action (if and as permitted by law, including, but not necessarily limited to, Cal. Civ. Code § 1780(e) and/or 18 U.S.C. § 1964(c));

J.     an award of pre- and post-judgment interest on any amounts awarded;

K.     an award of any applicable civil, statutory, or other penalty(ies) and/or damages available (if and as permitted by law);

82

L.    injunctive relief (if and as permitted by law, including, but not necessarily limited to, Cal. Bus. & Prof. Code § 17203) prohibiting Defendants from, *inter alia*, (i) continuing to use junk fees and drip pricing to impose tariff-related fees and/or surcharges, (ii) mislabeling those fees and/or surcharges as taxes, (iii) making Credits expire, (iv) engaging in unlawful, unfair, or fraudulent business acts or practices, (v) including information in their contract(s) with consumers that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their affirmative consent to any automatic renewal or continuous service, (vi) misrepresenting any material term(s) of the transaction(s); and (vii) obstructing or delaying consumers' ability to cancel their memberships

M.    injunctive relief (if and as permitted by law, including, but not necessarily limited to, Cal. Bus. & Prof. Code § 17203) requiring Defendants to, *inter alia*, (i) refund to members of the Pre-February 20 Tariff Class all amounts charged and/or collected as a result of, due to, and/or to offset any or all of the tariffs imposed by the 2025 Executive Orders, and (ii) present automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled;

N.    an Order retaining jurisdiction to monitor Defendants' compliance with injunctive relief granted;

O.    a declaration that a business seeking and/or receiving a refund from the federal government for amounts paid as a result of, due to, and/or offset any or all of the tariffs imposed by the 2025 Executive Orders is not a condition, precondition, or prerequisite for a consumer being able to seek and/or receive a refund(s) of any amounts the consumer paid to a business as a result of, due to, and/or to offset any or all of those tariffs;

P.    an Order allowing for amendment of this pleading if and as necessary to conform to evidence adduced at trial; and

CLASS ACTION COMPLAINT

Q.   such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.


Dated: June 19, 2026                Respectfully submitted,

**LYNCH CARPENTER, LLP**

*/s/ Todd D. Carpenter*
Todd D. Carpenter (SBN: 234464)
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
(619) 762-1910
todd@lcllp.com


Michael H. Sampson
(*Pro Hac Vice* Application to Be Filed)
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
(412) 322-9243
mike@lcllp.com

**Attorneys for Plaintiffs and the Proposed Classes**

84